POPE et al. v. SECKWORTH et al.

(District Court, W. D. Pennsylvania. October Term, 1891.)

1. SHIPPING—TYING UP RIVER CRAFT TO EACH OTHER—DAMAGES.
    The custom, if such it be, of tying up one craft to another on the shores of the Allegheny river, is merely a privilege, and imposes no duty upon the crew of the inner craft to make it secure enough to hold both; and hence where the owner of a flat-boat, in attempting to land by fastening to a barge, breaks the lashings of the latter, and draws it into the current, he is liable for the resulting damages.

2. SAME—WHO LIABLE.
    The owner of certain posts, having sold them to be delivered in Pittsburgh, agreed with the owner of a flat-boat, which was also sold deliverable there, that he would deliver the boat in consideration of being allowed to carry down his posts in it. In navigating the boat, the latter caused an injury to a barge. Held, that he was liable, but the owner was not.

In Admiralty.    Libel for damages to a river barge.
Stephen C. McCandless and Noah W. Shafer, for libelants.
J. S. & E. G. Ferguson, for respondents.

REED, J.    The question of jurisdiction was raised upon the argument of this case, but I have no doubt of the jurisdiction of admiralty in such a case as the present.    If authority is needed, it will be found by reference to the case of Ex parte Boyer, 109 U. S. 629, 3 Sup. Ct. Rep. 434, and the case of The Belfast, 7 Wall. 624.    Lewis Pope & Sons, libelants,

were on June 21, 1891, the owners of a certain barge, which on that day lay in the Allegheny river, at the foot of Twenty-Second street, in the city of Pittsburgh. It was laden with railroad ties and locust posts, belonging to Barrett & Dunbar, also libelants. No objection has been made to the joinder of these libelants in the one libel. The barge had been at this landing for several days, unloading part of its cargo, and, until Sunday morning, June 21st, was tied to another barge nearer shore. About midnight Saturday, the owner of the other barge took it out of the landing, and moved libelants' barge nearer the shore, and one of his crew tied libelants' barge to a raft lying just immediately above. Two lines were run from the timber heads of the barge to the raft, and were made fast to what is called a "lash pole" on the raft. This raft consisted of logs in the greater part, and at the lower end were a number of what are known as "walking beams." These are heavy timbers of considerable length, and probably 12 inches square, and the center timbers were run up among the logs in the main portion of the raft, so as to stiffen and brace the raft at the junction of the two classes of timber. The logs and beams were held together by lash poles, running across the raft at intervals, and attached to the logs by bows of oak about an inch wide and one-quarter of an inch thick. It was to the lower lash pole that the barge was tied. The barge remained in this position until the evening of June 21st, between 6 and 7 o'clock, when two flat-boats belonging to Andrew Seckworth, (or Siegworth,) one of the respondents, and laden with pit posts belonging to J. B. Hahn, and in charge of J. B. Hahn and Martin Hahn, floated down the river, moving with the current. The Hahns, desiring to land at this point, steered their boats in alongside of libelants' barge, and J. B. Hahn jumped upon the barge, and fastened a line to the barge, leading to his boats, for the purpose of stopping his boats. Almost immediately he felt the barge moving, and at once threw off the line; but the barge and the walking beams to which it was attached were caught by the current, and drifted down the river, (Mr. Hahn being rescued by some men in a skiff,) until they struck a pier of one of the bridges, and were wrecked, the barge being broken in two, and the walking beams scattered. The majority of the beams were recovered, and the wreck of the barge, with the greater part of its cargo, was picked up along the shores of the Ohio river. Upon subsequent examination, it was found that the walking beams had been pulled loose from the body of the raft; the bows, which held the lash pole across the wedge of beams referred to, and which held the raft together, having been broken. The lash pole and its bows, to which the barge was fastened, remained in good condition. The current was running at the rate of five or six miles per hour, but the barge, being in below the raft, was not exposed to the current until pulled out by respondents' boats.

Some of the respondents are liable for this injury. Had it arisen from collision, the presumptions would have been against the respondents. If simply moving along-side of the barge, they would have been bound to use great care to avoid collision; and, if it appeared that they had intentionally steered their boats against the barge, causing it to break

loose, and float away, they would be liable for the loss, however innocent their purpose might have been. I cannot see any difference in principle between striking the barge and pushing it out into the current, and fastening a line to it and pulling it out. Respondents attempted to show that the barge was not securely fastened on Sunday morning, when its position was changed, but are not supported in this by the testimony. The barge was fastened well enough to remain in position until Sunday evening. It is in testimony that there was no current below the raft, and hence no great strain upon the lines or fastenings. If the fastenings were weak, this was not the proximate cause of the injury, and at any rate the owners of the barge were not required to fasten it securely, with a view to its use as a tying post by any floating craft. It may be customary for craft upon this river to tie up to other craft, as claimed by the respondents; but, if so, it is only a privilege, and creates no duty on the part of the other boats to furnish secure fastenings. Numerous authorities might be cited upon the responsibility of the respondents, or some of them, for this injury; but it is sufficient to refer to the cases of *The Nellie*, 7 Ben. 497, and *Mills* v. *The Holmes*, 1 Bond, 356. In my judgment, the respondents J. B. Hahn and Martin Hahn are liable to the libelants for the damage arising in this case, but the responsibility of the respondent Seckworth is a more serious question. The testimony shows that he was the owner of the boats, and had sold them, deliverable in Pittsburgh. The Hahns had sold pit posts deliverable in Pittsburgh, and agreed to bring the boats to the place of delivery in consideration of the owner allowing them to load and convey their posts to the place of delivery. Mr. Seckworth was not upon the boats at the time, and had nothing to do with the navigation of his boats. His relation to the other respondents was that of a bailor, and he is not under any legal responsibility for their acts. The libel must be dismissed as to him. The libelants Lewis Pope & Sons are entitled to recover the value of the barge, which at the time of her loss was $300. The libelants Barrett & Dunbar are entitled to recover the damages suffered by them, amounting to $1,024.62, consisting of a loss of 45,245 feet of railroad ties, worth $791.79, a loss of 223 locust posts, worth $46.83, and the expense necessarily incurred by them in regard to what they saved of their property, amounting to $186. Both libelants are entitled to interest upon their respective amounts from June 21, 1891. The costs should be paid by the respondents J. B. Hahn and Martin Hahn.

Let a decree be drawn in accordance with this opinion.