THE AMERICAN EAGLE.

JONES v. THE AMERICAN EAGLE.

(District Court, N. D. Ohio, E. D. March 17, 1893.)

No. 1,998.

1. TOWAGE—LIABILITY OF TUG.
    Where a voluntary association of tug owners, organized merely for the purpose of preventing ruinous competition, is accustomed to receive orders for tugs, and a tug is sent in obedience to such an order, the contract of towage is with the tug, and not with the association.

2. SAME—NEGLIGENCE—OWNER'S RISK.
    The fact that, by the contract, certain towage is to be at the risk of the tow owner, does not excuse the tug from liability for negligence. The Syracuse, 12 Wall. 171, followed.

**3. SAME—BURDEN OF PROOF.**

The burden of proving that a contract of towage was at the owner's risk is on the tug.

**4. SAME—AGENCY.**

A purchaser of cedar ties sent two scows to be loaded with them at the seller's dock, who was to notify a voluntary association of tug owners that towage was wanted. A tug was accordingly sent by the association, but found the scow badly loaded, and refused to tow them except at the owner's risk. *Held*, that the seller's dock man had no authority to contract for their towage at the owner's risk, so as to excuse the tug from liability.

**5. SAME—ABANDONMENT OF TOW—NEGLIGENCE—EVIDENCE.**

The tug proceeded with the scows down the Cuyahoga river to Lake Erie, but, finding a heavy swell on the lake, thought it unsafe to venture out, and thereupon returned up the river, tied the scows up to a dock, and left them without lights or a watchman. *Held*, that the tug was liable for damage resulting from the scows being carried away from their moorings, whether caused by a defective rope, insecure tying, or other causes, unless the owner had notice of and consented to the arrangement.

**6. SAME—BURDEN OF PROOF.**

The burden of proof was on the tug to show that the owner of the scows had been notified of the disposition made of them, and had consented to it.

**7. SAME—LOCAL USAGE.**

A local custom of tying tows up to the river bank under such circumstances, and sending notice to the owner, has no foundation in law, and will not excuse the tug from its liability.

In Admiralty. Libel by Wyndham C. Jones against the tug American Eagle on a contract of towage. Decree for libelant.

Lee & Tilden, for libelant.
H. D. Goulder, for respondent.

RICKS, District Judge. This is a libel filed by Wyndham C. Jones to recover for damages to scows, and for the loss of a lot of cedar ties loaded upon two scows, which it is alleged the respondent contracted to tow from the docks of Norris & Co., in the Cuyahoga river, out to the west shore of the lake within the breakwater west of the piers, on or about the 20th of August, 1890. The facts are that the libelant was the owner of the ties referred to, which he desired to have transported for some work being done on the west shore of the lake at the point named. He had purchased these ties from Norris & Co., and had sent there, to be loaded, two scows of his own build and construction. When loaded, Norris & Co. were to notify the Vessel Owners' Tug Line, and they were to send a tug, and have them transported to the point named. The scows were loaded, and on or about the date aforesaid Capt. Collier was notified by Norris & Co. that the scows were ready to be towed out. Thereupon the clerk of said association signaled the American Eagle, and she went to Norris & Co.'s docks, and undertook to tow the scows to their destination. The captain of the tug claims that when he reached Norris & Co.'s dock he saw the scows were overloaded, and that the ties were improperly piled, and that the tow was not in proper shape for safe transportation, and so notified the foreman at that dock.

Thereupon he claims the foreman told him to proceed, take the scows, and do the best he could with them. The captain of the tug refused to take them, except at the owner's risk, and thereupon he says the foreman of the dock told him he might so take them, and under those conditions he assumed to tow the scows out. He fastened them to his tug, and with some difficulty proceeded as far as the mouth of the river, when he found a dead swell on the lake,—too much sea to enable him to safely tow the scows to the point designated,—and thereupon he returned up the river, tied the scows up at a point on the dock near the mouth of the Old river, and, proceeding further up the river, notified the clerk at the Vessel Owners'· Tug Association office what he had done, who in turn, it is claimed, notified the consignor. He does not claim that he gave any further notice, or paid any further attention to the scows. He admits he tied them up without lights, and without any one to watch them, but claims he put them at a safe point in the river, where they were not liable to be disturbed by passing vessels, or injured from that or other causes. The defense is—First, that there was no contractual relation between the libelant and the tug, and therefore the tug cannot be held liable under the contract for towage; second, that the towage was undertaken at the owner's risk; third, that, having found that he could not safely tow the scows to their destination, he fastened them securely in the river at the point above stated; that the libelant was notified of the place at which they were tied, and acquiesced in this disposition of the scows by the tug, and agreed that they might remain there at the owner's risk. These are substantially the grounds of defense relied upon.

Let us first consider the first defense relied on. The answer avers that the Vessel Owners' Tug Association is a voluntary organization made up of the owners of the different tugs belonging thereto, and doing service in the Cuyahoga river and in the harbor adjacent, and that the contract in this case, whatever it may have been, was made with the Vessel Owners' Tug Association, and not with the tug American Eagle. In support of this averment in the answer, no written contract of the association or articles of incorporation were offered, and no evidence of the kind to show the exact character of this Vessel Owners' Tug Association was produced. On the contrary, it appears from the evidence of Capt. Dahlke of the tug American Eagle that, while the tugs comprising that association pooled their earnings, each tug was liable for its own negligence, and that he had made independent contracts of towage utterly regardless of the association. It seems from the evidence before me that this is a voluntary association, organized for the purpose of preventing ruinous competition among the different tugs in securing vessels to tow, and to prevent them from that strife and such useless struggles as are frequently indulged in by rival tugs, each seeking to secure all the towing possible. In this view of the testimony I have no hesitation in finding that the contract of towage in this case was between the libelant and the tug, and that, if the loss was the result of the negligence of the tug, she is responsible.

We next proceed to a consideration of the second defense relied

upon, to wit, that this contract of towage was undertaken at the owner's risk. Conceding, for the purposes of the argument, that the foreman of the dock at Norris & Co.'s had authority to make such a contract for the libelant,—a point which cannot be maintained,—it nevertheless is a well-settled principle of law that such a contract does not release the tug from any loss resulting from its own negligence. In the case of The Syracuse, 12 Wall. 171; Mr. Justice Davis says:

"It is unnecessary to consider the evidence relating to the alleged contract of towage, because, if it be true, as the appellant says, that by special agreement a canal boat was being towed at her own risk, nevertheless the steamer is liable if, through the negligence of those in charge of her, the canal boat has suffered loss. Although a policy of the law has not imposed on a towing boat the obligation resting on a common carrier, it does require on the part of the persons engaged in her management the exercise of reasonable care, caution, and maritime skill; and if these are neglected, and disaster occurs, the towing boat must be visited with the consequences. It is admitted in argument, and proved by evidence, that the canal boat was not to blame; and the query, therefore, is, was the steamer equally without fault?"

In that case there was a written contract between the canal boat and the steamer, by which the boat was towed "at the risk of her master and owners,"—that is to say, under a contract on the part of the libelant that he would bear the risks of navigation, provided the steamer which furnished the propulsive power was navigated with ordinary care and skill. That case seems to be conclusive.

But, even if there were any doubt as to this principle of law, the facts in the case do not make out a contract such as the respondent relies upon to excuse it from the liability in this case. The foreman of the dock at Norris & Co.'s yard had no authority to bind the libelant in any such contract. The burden of proof on this point would be upon the captain of the tug, and he utterly fails to establish his claim by the preponderance of evidence required, even conceding the authority of the foreman of the dock. The ties were sold to the libelant by Norris & Co. The title to the ties passed when the scows were loaded and delivered to the tug, and the foreman of the dock was in no respect the agent of the libelant. He cannot even be claimed to be the agent of the consignor with power to bind the consignee by any such contract.

The only remaining question, therefore, is whether the tug discharged its duty under the contract of towage, assumed by undertaking to deliver these scows under the facts stated. Conceding that the captain was the better and the proper judge of whether there was such a dead swell on the lake as made it dangerous for him to undertake to tow the scows out to their place of destination, and assuming that his judgment in this respect is conclusive upon the parties, the question yet remains whether he did his duty in tying the scows up on the river bank at the point named, and under the circumstances heretofore stated, after determining that he could not safely tow them for the reasons aforesaid. There can be no question but that the scows were in his charge from the time he took them from the Norris dock. His contract was to de-

liver them safely at their place of destination, or otherwise account for them to the satisfaction of the owner. It has been claimed that, according to the custom of tug men in this harbor under such circumstances as we have now before us, it was proper and usual for the tug to tie them up to the river bank, and send notice to the consignor or owner where they were. If any such custom exists, it has no foundation in law. A tug cannot be discharged of its responsibility in that way. If the libelant had been promptly notified, at the time, that the tug could not safely tow these scows to their destination, and had consented that the tug might tie them up at some dock on the river and leave them there without a watchman or lights, and had assumed all risk of damage from such exposure, the tug would of course have been legally released from all obligation under its contract. But no such proof of notice or waiver of risk on the part of the libelant has been shown. On the contrary, it appears that, while the scows were tied up in what is claimed to have been a safe place along the river bank, they were left without lights and without a watchman. I think the respondent has failed to show by sufficient evidence such notice to the libelant as either enabled him to look out himself for their protection, or to make any arrangements with the tug to protect them.

I think the principles announced by Judge Nixon in the case of Cokeley v. The Snap, 24 Fed. Rep. 504, apply to this case. In that case, a steamboat had agreed to transport a canal boat from Hoboken, N. J., to Spuyten Duyvil creek. When the steamer reached the mouth of the creek she found an accumulation of ice on the eastern shore of the river. The western, or New Jersey, shore was comparatively free from ice, and the master of the tug towed the canal boat to the western shore; but, not finding a safe landing place, proceeded onward to Shadyside. The canal boat was deeply loaded, drawing about six and a half feet of water. The tide was half ebbed, and there was only a sufficient depth of water to drop the boat at the river end of one of the piers at Shadyside. She was left there against the remonstrance of the captain of the canal boat, as the libelants allege, and with his passive assent, as the respondents insist, but with the promise from the captain of the tug that he would return the next morning and remove her to a more safe landing place. He did not, however, return. The boat was suffered to remain there during all of the next day and night. On the afternoon of the succeeding day the wind changed to the east, driving the floating ice from the eastern to the western shore of the river. She was caught by the ice and caused to sink, thus inflicting the damage to the boat of which the libelants complain. Upon this state of facts, Judge Nixon held:

"The master of the tug undertook a certain service, to wit, to tow the boat to the landing in Spuyten Duyvil creek. He was prevented by the ice from completing the trip, and hence was excusable for its nonperformance. But his duty under the contract did not end there. He was still bound to take reasonable care of the boat and her cargo. He might have returned with her to Hoboken on the same afternoon; but he states he was afraid to undertake the trip, there being a strong head wind, and the boat being heavily laden, old, and weak. Then he could have remained with her dur-

ing the night, ready to proceed the next morning to this destination, and to render any aid which changes in the wind or weather might require. He did neither, but left her at the end of the pier at Shadyside, and towed another boat lying there back to New York. He assumed the consequences of such an abandonment, and the damage was caused by a change of wind on the next day. He undertook such risk, and must be held responsible, as I find no proof which shows that the canal boat in any way contributed to the damages."

Apply the principles here announced to the case before us. When the respondent found she could not safely tow the scows to their destination, it was her duty either to notify the libelant and return the scows to his possession at Norris' dock or elsewhere, or it was her duty to tie them up safely in some secure place, and protect them until she could tow them out to the point called for by the contract. Nothing short of this could release her from the performance of her duty under the towage contract.

The contention that the libelant was notified as to where these scows were tied up, and that he was satisfied therewith, and that thereby the tug was discharged, is not sustained by the proof. The burden on this point is with the tug. It has not been met by the degree of proof required.

With these views of the law, and under the findings of fact as made, it is not necessary to consider the other points insisted upon in the argument. The question of whether the scows were properly loaded, and whether they were carried away from their mooring by defective rope, by not being tied up securely, or from having been loosened by other causes, it is not necessary now to discuss or consider. A decree will therefore be entered for the libelant, finding the respondent guilty of negligence in the respects indicated in this opinion, and a reference to a master to assess the damages.