### THE BATTLER.

### SCHRADER v. THE BATTLER.

(District Court, E. D. Pennsylvania. June 2, 1893.)

**1. TOWAGE—NEGLIGENCE—ANCHORAGES—CUSTOM AND USAGE.**

A tug with two barges in tow left Philadelphia on a voyage to Boston, but when near the ocean the indications of bad weather were such that she deemed it unwise to proceed to sea, and anchored her tow near Brown shoal, in Delaware bay. She left them there on Thursday evening, and, engaging in other towage services, did not return until Saturday. At this time the signs of bad weather had increased, so that the tug left the barges for other towage services, and never returned to them, for the wind increased to an unusually violent gale, and on Tuesday they sank. *Held,* that though the tug followed an established custom in anchoring her tow to await a change of weather, and engaging in other towing, it was her duty to provide a safe anchorage, and to keep such watch over the tow as to enable her to render whatever assistance it might need.

**2. SAME—NEGLIGENCE—EVIDENCE.**

Several experienced mariners testified that Brown shoal, owing to its exposure to the ocean swell, was not a proper place for a vessel to ride out a gale at anchor, and that it was never resorted to for that purpose. It was shown that there were several safe anchorages further up the bay, where vessels had ridden out the gale in question; and there was evidence that the tug might have moved the barges thither before they were lost, had she not been otherwise engaged. *Held,* that she was guilty of negligence that rendered her liable for the loss of the barges.

In Admiralty. Libel by John Schrader, owner of the barges Tonawanda and Wallace, against the steam tug Battler (Clarence

L. Tingle, master) for the loss of the barges by the alleged negligence of the respondents. Decree for libelant.

Edwd. F. Pugh and Henry Flanders, for libelant.
J. Rodman Paul and Morton P. Henry, for respondent.

BUTLER, District Judge. On September 4, 1889, the tug Battler took the barges Tonawanda and Wallace, loaded with coal, in tow at Philadelphia, in pursuance of a previous contract, to convey them to Boston, and proceeded down the Delaware river and bay until near the sea. Deeming it unsafe to go further, in view of the weather prevailing there, she anchored the barges in the mouth of the bay at Brown shoal, about 4 o'clock of the same day. Leaving them immediately thereafter, she engaged her services to the bark Hickman (just arrived from sea) for a voyage to Philadelphia; from which place she returned on Saturday morning. By this time the indications of bad weather had materially increased. The tug rendered no further service to the barges, but employed her time in assisting others, who hired her aid. The wind continued to increase; on Monday it was very high and threatening, and on Tuesday had become an unusually violent gale. On the latter day both barges sank, and were lost—the crews being saved by another tug while the Battler was still absent.

Stopping here a very plain and very gross case of carelessness would be made out against the tug. In explanation of her conduct, however, she avers and produces evidence to prove that in towing on this voyage it is customary, on reaching the mouth of the bay and encountering an easterly wind, with indications of bad weather at sea, to anchor the tow there, as the Battler did; and, while awaiting change of weather, for the tug to engage in such other service as may offer; that the anchorage ground selected was proper for the occasion, and as good as any in the vicinity.

I find that it is customary to anchor and await change of weather, under such circumstances; and that tugs engaged in this service do in the mean while generally accept other employment. I also find that the condition of the weather justified the Battler in declining to proceed further on Thursday evening. There were such indications of bad weather as might have rendered her responsible for any loss sustained by going to sea at that time. The testimony on both sides sustains this view; and the fifth article of the libel virtually admits its correctness. Whether the voyage might have been resumed with propriety the next morning is not clear. I incline to believe that its resumption at that time would have been unwise.

The inquiry is thus reduced to the question: Did the tug select an anchorage suitable for the occasion, and exercise proper care for her tow thereafter? It was her duty to select a place suitable to ride out the anticipated storm. She could not foresee a tempest such as came. It was very extraordinary. But she

was bound to anticipate a storm of more or less violence, and to leave the tow in a place of comparative safety during its continuance. She was furthermore bound to keep watch over it— not constantly, but occasionally and seasonably—to ascertain whether assistance was needed. A custom at variance with the exercise of such care would be unreasonable and should be condemned. Such tows are virtually helpless in bad weather; and their loss involves not only property, but human life as well.

Was the place at which the tow was left throughout the storm proper for the occasion? If none better could be found within reach it was. A few miles higher up are several other anchorage grounds, among which are Fourteen-Foot bank, Miah Maule, and Middle anchorage. A careful examination of the testimony has satisfied me that either of these places, and especially Fourteen-Foot bank, affords a much safer place for such an occasion than the one below; and that the latter is very unsafe during the prevalence of severe storms. The evidence is conflicting and irreconcilable; but its weight sustains the view expressed. A discussion of the subject would amount to little more than arraying the testimony on one side and the other, and this would be of no value. The situation, customary use, and relative safety of the several places named are in my judgment correctly described by Capt. Albertson, apparently a very intelligent man, who for 20 years was master of Reading Railroad coal steamers and had much experience of the waters in this locality. He says:

"I do not know of any good anchorage whatever at Brown shoal. I never considered that place a harbor. It is too bleak, and is open to the full sweep of the ocean. There is a general cross current there that makes it very rough with the wind blowing, and vessels lay very badly. * * * Between the currents a great deal of water will come aboard. As soon as you get below the Brandywine shoal (which is between Brown shoal and Fourteen-Foot bank) you begin to take the sea that comes in there, and it boards the vessel at a fearful rate. I have gone down when it has been quite smooth until I got to the lower end of Brandywine shoal, where the sea has boarded us so that it has not been safe to go around on deck. The water has a great sweep from the ocean down there, but before it gets up to Brandywine shoal it meets with a great deal to break it off. It has such a roll from the ocean down there and produces such a heavy undertow that it is hard for vessels to lay there. I have never seen vessels anchored at the Brown shoal, south of the Brandywine, for harbor in heavy weather. I have seen vessels there temporarily. I never anchored there for harbor, nor saw a vessel anchored there for harbor. Vessels anchored there temporarily, when 'tide nipped,' or in fog, but never in heavy weather outside. Of choice I would rather take the open sea to ride out a gale than an anchorage at Brown shoal. Miah Maule we always considered a good safe harbor."

He further testifies that vessels of all sizes and descriptions and in all kinds of weather, anchor there, and at Fourteen-Foot-bank. The same in substance is the testimony of Henry C. Burge, an old experienced shipmaster, Capt. Smith, Capt. Hatch, Capt. Naylor, Capt. Willits Miller and many others. It is a significant fact that the Tonawanda's master, when starting upon the voyage, requested the tug's captain not to take him below Fourteen-Foot bank, if the

weather should prove unfit for going to sea. That the request was made I have no doubt whatever. Both the master and his mate testify to it. While the tug's master remembers conversation on the subject he does not remember that it referred to this shoal. The request leaves no doubt in the mind that the captain of the Tonawanda, who was familiar with the locality, believed that it was unsafe to anchor lower down. There is no doubt whatever that many vessels anchor at Brown shoal, but the weight of the evidence fully justifies a conclusion that such anchorage is for short periods, to meet such emergencies as Capt. Albertson speaks of; and that it is not resorted to as a refuge from storms, when points higher up can be reached. Directly in the mouth of the bay, it feels every motion of the sea, and naturally would be avoided by vessels seeking harbor.

The tug was therefore clearly wrong in leaving the barges where she did. It was a mistake to anchor there even for a single night, under the circumstances; but it was wholly inexcusable to leave them there during the continuance of the storm, until they were lost. Up to Monday they could have been removed with safety; and I believe they would have been removed if the tug had felt as much care for their protection as she felt for obtaining money by other employment. I attribute her conduct entirely to her greed. Going off on Thursday evening and remaining away until Saturday morning, under the circumstances, was inexcusable; and her failure to tow the barges higher up or attempt anything for their safety afterwards, was gross negligence. But for the friendly assistance of others the crews would have been lost, as well as the vessels. To say nothing could have been done—that to have moved the barges higher up would not have saved them—is simply to speculate about what cannot be known, and does not even tend to excuse the fault. The barges were entitled to her efforts for their protection; and having failed to make any such efforts her answer that nothing available could have been done is entitled to no consideration. I scarcely doubt that they would have been saved if they had been taken to one of the anchorages above. They were at least entitled to the chance of safety there. Other vessels rode out the storm without damage at Fourteen-Foot bank. It is of no consequence if some anchored there did not; the barges might have been as fortunate as those that did. I am not satisfied however that any vessel was lost there. I think the evidence justifies a conclusion that none was. For these reasons the libel must be sustained; and a decree may be prepared accordingly.