SLOVER v. THE ERIE R. R. CAR FLOAT NO. 4.

(Circuit Court of Appeals, Second Circuit.   April 24, 1899.)

No. 124.

COLLISION—CAR FLOAT—DUTY TO CARRY SPARE LINES.

Where a car float was equipped with mooring lines adequate to resist the effect of wind and rough weather, the failure to have spare lines sufficient to withstand both the force of the wind and the impact of a steamer that drifted against her was not a negligent omission on the part of the float, rendering her liable for damages done while adrift.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel by Charles Slover against the Erie Railroad Car Float No. 4 to recover damages done to libelant's canal boat by the float while she was adrift.   The tug C. P. Raymond was subsequently made a defendant, upon the claimant's petition, which alleged that she was the one in fault.   The petition was dismissed as against the tug, and a decree was entered against the float.   89 Fed. 877.   From the part of the decree which found the float in fault, an appeal was taken.   Reversed.

Geo. B. Adams, for appellant.
Peter S. Carter, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge.   On the morning of April 3, 1895, the Erie Railroad Company's car float No. 4, loaded with cars, was towed from Jersey City to the Erie Basin, and was placed across the end of Richards Street Pier, where it reached beyond the sides of the wharf at each end.   The wind was blowing hard from the northwest, and the float was made fast by a line at the stern, and also at the bow.   Each line was of 5½ inches, was new and strong, and was securely fastened,—one by three turns, and the other by two turns.   In about 2½ hours the large steamship Cacique came into the basin under her own steam, and assisted by three tugs, of which the C. P. Raymond was one.   The pilot of the Cacique caused her to approach the float so as to ask her to move to the southward, and not to overlap the side of the pier where the steamship was to moor.   The district judge found that the steamship probably drifted "against the car float, so that with the added force of the contact of the steamship, and her pressure against the side of the float while subject to the northwest wind, which was nearly astern, the mooring line by which the float was moored to the wharf gave way, so that the float, after the steamship had backed out for the purpose of going to the northerly side of the wharf, swung outward, and subsequently parted her forward line, so as to be completely adrift."   Before she parted this line she swung against a vessel moored on the southerly side of the wharf, and, when she was entirely adrift, she drifted into and damaged the libelant's canal boat, Corner Stone, which was laid up in the Erie Basin for the winter.   The libel was brought to recover for that

damage, and the C. P. Raymond was subsequently made a defendant, upon the claimant's petition, which alleged that she was the one in fault. The district judge relieved her from that charge, for, if there was negligence, it was that of the steamship; and the petition against the tug was dismissed, and decree was entered against the float. From the part of the decree which found the float in fault, this appeal was taken. The facts are now undisputed, and the only question is as to the proper inference from the facts as found.

The district judge said:

"I do not find that any blame is to be attached to her for mooring where she did, or in respect to the lines by which she was made fast. Both lines were in good order, and of the usual strength, and her breaking away is naturally accounted for by the contact and pressure of the steamship in a very high wind."

After saying that after one line broke she was held by the other line, and remained in that position for some little time, and that no other line was on board the boat, by which the floatmen could have added to her security, he placed her liability upon the absence of a spare line, as follows:

"It is urged that the lack of any spare line for such a purpose was a failure in the reasonable equipment of the float for emergencies, such as to make the float liable for subsequently breaking away, and that there was abundant time and opportunity to have increased her fastening by added lines, had any such lines been aboard, and that this would have prevented the subsequent damage. After consideration, I feel constrained to sustain this contention, in view of the constant emergencies arising in navigation, and the ordinary practice, from time immemorial, to have spare lines on board to meet them. The mere fact that similar floats have not been in the habit of carrying any spare lines cannot be admitted as a defense, or as dispensing with the requirements of reasonable prudence so long understood and recognized in navigation."

The float left Jersey City with lines adequate to resist the effect of the wind and the rough weather, but inadequate to withstand both the force of the wind and the impact of the steamer which was permitted to strike her. The conduct of the steamer was not to be expected, and it does not seem that the absence of provision against such a calamity was a negligent omission on the part of the float. It would be improvident not to provide extra ropes upon a vessel which is about to depart upon a voyage, but the testimony is that the float, which was to move about the harbor for three or four days, was furnished with the equipments ordinarily provided upon a float of her size. The injury to her ropes came from a cause which was unusual, and outside of the perils which prudence could be expected to anticipate. We are of opinion that the injury to the Corner Stone was not one which can be said to have been occasioned by the negligence of the float. The portion of the decree of the district court which was appealed from is reversed, with costs, and the case is remanded to that court, with instructions to dismiss the libel, with costs.