THE NO. 6H.

THE NO. 7H.

THE ADMIRAL.

THE JAMES D. LEARY.

(District Court, E. D. New York. April 16, 1901.)

1. SHIPPING—VESSELS MOORED TO OTHERS—LIABILITY FOR NEGLIGENCE.

Two scows owned by libelants were moored to the breakwater in Erie Basin by strong lines, which were sufficient to withstand any strain which such vessels would have put upon them had not the three respondent scows moored to them on the outside. The following morning the wind was high, and there was danger of the vessels breaking away, but the masters of respondent scows took no measures to assist in strengthening the fastenings. The masters of libelants' scows called out to them of the danger, but their suggestion was unheeded, and beyond that they did nothing. The lines finally parted, and libelants' scows were drifted against other objects, and sunk. *Held* that, while the action of respondents in tying up to the other scows was lawful, and in accordance with the custom of the port, it was their duty, when the safety of all the vessels required it, to put out lines to assist in making them secure; that it was

also the duty of the masters of libelants' vessels, having knowledge of the danger, and that nothing was done by the outlying scows, to use some diligence to strengthen their lines for the protection of their own vessels, and that the damages should be divided, one-third to be borne by libelants and two-thirds by the outlying scows, as between themselves to be divided equally.

2. TUG AND TOW—MOORING OF TOW DURING STORM—LIABILITY OF TUG.
A tug, during stormy weather, took her tow to a proper place, where she could safely outride the storm, and left her, moored to other scows, and in charge of her master. During the storm, the tow, although having knowledge of the danger, and ample opportunity, took no measures to extend lines of her own to the breakwater, to which the inner scows were moored, or to assist in strengthening their lines, in consequence of which such lines parted, and she was held liable for resulting injury to the other scows. *Held*, that there was no ground for placing such liability upon the tug, which was not charged with the duty of seeing that her tow was equipped with proper lines, or that she made proper use of them.

In Admiralty.

Peter S. Carter, for libelants.
James J. Macklin, for the No. 6H and No. 7H.
Louis B. Adams, for the Admiral.
Butler, Notman, Joline & Mynderse (F. M. Brown, of counsel), for the Leary.

. THOMAS, District Judge.   On Saturday, February 24, 1900, two scows (herein called "R scows") .were moored alongside the breakwater at Erie Basin with good and strong lines, which would have been quite equal to withstand the strains put upon them by the tempestous weather that occurred on the following morning had not two other scows (herein called "H scows"), during the afternoon and evening of the 24th, moored to the R scows, and a little later another scow, the Admiral, moored alongside the H scows.   So five scows, lashed together, depended upon the lines of the R scows. When the scows were placed alongside on February 24th, the wind was in the south or southeast between 2 and 9 o'clock p. m., and in the southwest from 10 to 12 o'clock.   Its velocity in the earlier part of the evening varied from 28 to 35 miles per hour, but declined between 8 and 11 o'clock from 19 to 8 miles per hour.   On the 25th, from 1 a. m. to 3 p. m., the wind was west, with a velocity increasing from 25 to 45 miles per hour; at 3 p. m. it was southwest, with a velocity of about 46 miles per hour; at 4 p. m. it was north, with about the same velocity; at 5 or 6 a. m. it was northwest, with slightly increased velocity; and at 7, 8, 9, and 10 a. m. it was north, with a velocity of about 55 to 58 miles per hour.   When the scows were placed alongside on February 24th, the wind, previously strong, had moderated; but the weather was not suitable for the scows to go to sea, and hence their presence in the basin, which was an entirely suitable refuge.   The increased violence of the wind on the morning of the 25th brought too great strain upon the lines of the R scows, which were not assisted in holding by any lines from the outlying scows.   At about 9 o'clock the mooring lines parted, and the tier of boats was blown further out into the basin, the R scows came in collision with other objects, and both sank; and for

the injury thus done the libel is filed. The owners of the R scows libeled the H scows and the Admiral, and the Admiral then brought in her tug Leary, who had placed the Admiral alongside the H scows.

The following conclusions have been reached: (1) The lines of the R scows were strong enough for her own purposes, but obviously not for holding the added scows after the wind grew violent on the morning of the 25th. (2) The master of each of the outlying scows had full notice of conditions gradually growing more and more dangerous, and ample opportunity on the morning of February 25th to make some effort to aid the holding of the tier of boats. He did not make the slightest endeavor to get a line to the dock, or to aid the mooring in any way, but rested in absolute indifference alike to his duty and danger. (3) The omission of the master of each scow to bestir himself in some degree, and to seek to strengthen the moorings in the presence of danger, was such negligence as makes his scow liable for injury to the R scows from the breaking away of the tier of vessels. The Energy, 10 Ben. 158, Fed. Cas. No. 4,485; The Lilian M. Vigus (D. C.) 22 Fed. 747; Meyers v. The America (D. C.) 38 Fed. 256. (4) The master of each of the R scows was on the morning of the 25th aware that the lines were in danger of parting, and claims to have called out to persons on the other scows with reference to that fact. He saw and appreciated the peril, and did no act whatsoever to guard against it, save to call out to the men on the other scows, knowing full well that his suggestion met with no practical response. Hence the R scows should bear some portion of the damage.

Concerning the last finding, it may be observed that the outside scows made fast according to the general custom of the port,—a custom necessary for the business of the harbor. In such case the outlying boats should have put out a line accordingly as necessity demanded it or the conditions permitted it. The Nora Costello (D. C.) 16 Fed. 869. When the boats were made fast, the necessity of a line to the pier on the part of the outer scows did not exist. On the morning of the 25th it did exist, and the men on the scows had full warning of it for several hours, and did nothing. This was a neglect of the duty owing to the libelants, and the libelants' masters in control of the R scows knew of the negligent omission. They spoke of the danger, but contented themselves with unheeded suggestions to the men on the outlying scows. Then they went back to the steam dredge lying abaft the R scows, which belonged to the libelants, and did absolutely nothing. It is a good rule that a person should not be idle when he sees his property endangered by another's negligence, but that he should use some energy to preserve his own interest. He is called upon to do only what he reasonably may, but he must act with good faith. The R masters undoubtedly saw the scows blown away, and by their inactivity aided their own injury. It should be noticed that the outlying scows were not trespassers. The masters of the R scows knew well that the others had made fast the night before. They did not order them away. They licensed the connection made to their boats, and thereby consented that they should moor as they did. In this regard the case is unlike Pope v. Seckworth (D. C.) 47 Fed. 830, and The John Cottrell (D. C.) 34 Fed. 907. Therefore, while

the R boats were not obliged to strengthen their own lines for the safety of outlying boats (Pope v. Seckworth [D. C.] 47 Fed. 830, 832), and while, if necessity arose, it was the duty of the outside boats to use care not to put too great strain on the R lines, yet, when the R masters saw that the burden of the licensed boats was likely to prove too great for the mooring lines, they owed the duty to their own scows of strengthening the lines, which could have been done, or to do some other act to avert the threatening disaster. If a man license others to come upon the floor of his building, and thereupon find that the added weight endangers the floor, he may not say, if the licensees fail to aid its strengthening, that he will calmly await the results of the danger at the licensees' risk. If there was danger here which the masters of the other scows should have apprehended, and which should have moved them to action, the R masters saw it too, with better opportunity to see and to act, and probably with superior resources and advantages, as they were on the pier. A master may not indolently stand by and expect the parting of his lines, under the continued strain of his own vessels and other vessels suffered by him to moor at his side, and place the whole blame upon his licensees, the consequences of whose negligence he uses no effort to thwart. Such composure and inactivity in anticipation of disaster should not be approved. The damages should be ascertained, and one-third thereof borne by the libelants and two-thirds by the outlying scows, each scow, as against the other outlying scows, bearing two-ninths of all the damage. The Brothers, 2 Biss. 104, Fed. Cas. No. 1,969; The Peshtigo (D. C.) 25 Fed. 488, 491. The legality of such apportionment is recognized in The Anerly (D. C.) 58 Fed. 794, 796. As each vessel, so far as appears, caused an equal strain, so each vessel should bear a corresponding portion of the damage. The Admiral urges that her tug, the Leary, should bear the Admiral's share. The Leary, under her contract of towage, was permitted to place the Admiral where she was, and was not obliged to provide her with lines. The Admiral should have been provided with mooring lines adequate to resist the weather that prevailed (Slover v. Erie R. R. Car Float No. 4, 37 C. C. A. 154, 95 Fed. 495), and the Leary could presume such provision. The place of leaving the Admiral was proper. She was left where she could ride out the storm. If the cause of the accident had been insecure anchorage ground, due to some dangerous conditions, the failure of the Leary to return might have been culpable. But the proximate cause of the accident was the failure of the Admiral to pay due attention to the mooring lines, and the Leary owed her no duty to return and look after her in that regard. The Leary might presume that a scow would be equipped with mooring lines, and that she would use them when necessity required. It was not the duty of the Leary to provide her with mooring lines, or to make them fast for her, under the circumstances here present. For such purpose the Leary did not owe the Admiral the duty of returning. It undoubtedly is the duty of a tug, in seeking refuge from a storm, to use care to leave her tow in a proper place, and it is also her duty to use some oversight concerning her with reference to dangers which she ought to apprehend. But the Leary was not called upon to apprehend neglect

of her tow to put out a proper line, nor to suspect that she might not have usual mooring lines. In Meyers v. The America (D. C.) 38 Fed. 256, a tug and her tow were held liable because the former placed the latter in a dangerous position alongside another vessel, moored at the wharf, whereby the tow grounded, and listed over towards the wharf, catching the inner vessel, and holding her under until the rising tide covered her. It was considered that it was certain that the outer vessel would ground, and that it was reasonable to expect that she would list towards the wharf, and, on account of her superiority in size, cause injury. In The American Eagle (D. C.) 54 Fed. 1010, a tug was held liable for tying scows in tow up to a dock, and leaving them without lights or watchman, in consequence of which they were carried from their moorings, either by reason of a defective rope, or insecure tying, or other cause, and injury resulted. It was found that the owner of the scows had no notice of the disposition made of them, and did not consent thereto. No one was left aboard to look after them, nor was the responsibility of protecting them in any way lifted from the tug. The circuit court of appeals, Second circuit, in Morse v. The Charles Runyon, 5 C. C. A. 514, 56 Fed. 312, held that a tug was liable, who, being turned back by heavy weather, left a canal boat at a pier to which the master objected as unsafe, in consequence of which the canal boat at low water broke in two, and sank. The tow was placed in an unsafe place, and the evidence showed that the captain of the canal boat was both anxious and earnest in his attempt to gain assistance and to save the boat and cargo. In The Thomas Purcell, Jr., 34 C. C. A. 419, 92 Fed. 406, it was held that a tug was responsible for the loss of a barge laden with coal, which she anchored in the evening in an exposed place, thereupon proceeding to another port, where, by reason of not keeping a watch during the night, her master was not advised of an approaching storm in time to save the barge before it sank. Here the obvious fact was that the tow was placed in an exposed place, temporarily abandoned, and no watchfulness of changing conditions observed. In Hastorf v. The Governor (D. C.) 77 Fed. 1000, it appeared that a tug having in tow a scow to be taken to sea was obliged to put back on the approach of a southeast gale, and thereupon moored the tow outside of Atlantic Basin, which was safe from a southeasterly gale, but unsafe in high westerly winds. During the night the wind shifted to the westward, and the boat was damaged by pounding. The court held that the tug was in fault, either for not taking the tow inside the basin, or else for not maintaining a sufficient watch during the night, with help at hand sufficient to remove the tow in time to prevent damage upon any change of the wind to the westward,—which was a change to be reasonably anticipated. But in this case, as in the others, the conditions from which the injury arose were those against which the tug would be presumed to provide. In Phœnix Towing & Transp. Co. v. City of New York (D. C.) 60 Fed. 1019, Judge Brown made a similar holding, which was to the effect that there was no custom or usage between the parties that authorized the tug to leave the scow at the place where she was, without previous arrangement with the libelant, although two other scows had been left there by libelant's direction

during the few days previous. In the case at bar there is evidence of a consent to do the very thing. In the case cited it appears that at the time of mooring the scow the weather indications were threatening, and the master of the scow protested against being left there. Nothing of the kind appears in the case at bar. It also appears in the case cited that during the night it blew a gale from the northwest, and in the morning the scow was found to be damaged; and it was held that, although the scow was left at the Erie Basin breakwater or sea fence, where it was comparatively safe, except as against strong westerly winds, during the night the wind changed from southward to a violent westerly gale, and the scow sank from pounding. This was a condition against which the scow could not guard herself. The tug was bound to use care with reference to her tow pounding, and keep watch of her in this regard. In The Battler (D. C.) 55 Fed. 1006, a tug with two barges left Philadelphia for Boston, but when near the ocean the indications of bad weather were such that the tow was anchored near Brown Shoal, in Delaware Bay. The tug left them there on Thursday evening, and engaged in other services until Saturday, at which time the signs of bad weather had so increased that the tug left the barges for other towage services, and never returned to them, and on the following Tuesday they sank during an unusually violent gale. It was held that, although the tug followed an established custom in anchoring her tow to await a change of weather, and engaged in other towing, it was her duty to provide a safe anchorage, and to keep such watch over the tow as to enable her to render whatever assistance it might need, and that such safe anchorage was not provided, and that such care was not observed. But the circuit court of appeals (The Battler, 19 C. C. A. 6, 72 Fed. 537) reversed this holding, and decided that the anchorage ground was safe and proper, and that the tug was not liable for the loss of the tow during the extraordinary and terrific gale, either as regards the place of anchorage, or for not removing them further up the bay before the storm broke. And it was further considered that the fact that the tug, pending threatening weather, left the vessels at their anchorage, and engaged in other towage, was not a ground for liability for their loss during an extraordinary storm, where it appeared that the barges were equipped with all the appliances for safe anchorage, and were as capable of riding out a gale as full-rigged ships, and that it was the common practice to leave barges so anchored; and that, even if the tug had been present, she would have been unable to have prevented the disaster. In the case at bar the place of anchorage was proper, and the injury did not result from any one of the causes suggested in the cases cited and other cases to which the attention of the court has been called, but either from a failure of the Admiral to have proper mooring lines, or, if she did have them, from the failure of her master to make use of the same. Hence the Leary is not holden for the present injury.