## THE PRINTER.

(District Court, W. D. Washington, W. D. August 17, 1907.)

### No. 438.

TOWAGE—LOSS OF TOW—INSUFFICIENT ANCHORAGE.

A tug which had engaged to tow two schooners out of Gray's Harbor to sea started with them, but, the tide not being favorable for crossing the bar, anchored the two vessels inside the bay to await the proper condition of the tide on the next day, and left them. The wind was high at the time from the east, and increased later and the tide was ebb. At once one of the vessels commenced to drift; it appearing from a preponderance of the evidence that the anchor chain parted. Another anchor was dropped, but its chain also parted, and the vessel drifted on the bar and was wrecked. Both anchor chains were worn and rusted. The other vessel remained safe at her anchorage. *Held*, that the tug was not in fault for not at once taking the vessels over the bar, although it could possibly have been done with safety, that being a matter as to which the master was required to exercise his judgment, but that she was in fault for anchoring the vessels so near together that the one which was wrecked could not use a proper length of anchor chain and for leaving them without seeing that both were securely anchored; that the wrecked vessel was also in fault because of her defective and insufficient anchor chains, and entitled to recover only half damages from the tug.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Towage, §§ 23, 25.]

In Admiralty. Suit in rem, to recover damages for the loss of the three-masted schooner Alcalde, alleged to have been caused by negligence in the performance of a towage contract. On the evidence, the court decides that the loss of the Alcalde was caused by concurring negligence of the owners and masters of both vessels, and that the damages and costs be divided equally.

H. W. Hutton and W. L. Sachse, for libelants.
Austin E. Griffiths, for claimant.

HANFORD, District Judge. In the month of February, 1904, the steam tug Printer undertook to tow the three-masted schooner Alcalde, together with the schooner W. J. Patterson, both loaded with full cargoes of lumber, from Aberdeen on Gray's Harbor, in the state of Washington, outward to sea. The weather on that day was cloudy and wet, and there was an east wind prevailing, the velocity of which, according to the record of the weather station at North Head, 40 or 50 miles from Aberdeen, until 1 o'clock p. m., was from 16 to 21 miles per hour, and increased in force during the afternoon to 28 miles per hour, and continued to increase to 39 miles per hour at midnight; the highest velocity during the day being 44 miles. This record indicates the proximate force of the wind affecting the case with greater accuracy than any other evidence submitted. The vessels started from Aberdeen about 11 o'clock a. m. on a flood tide, and about one hour before the time of high tide. There is a bar at the entrance of Gray's Harbor, and it is not deemed by navigators to be prudent to attempt to take a vessel over the bar on an ebb tide, and for that reason the tug took the two vessels to an anchorage near the north shore of Gray's Harbor, about seven or eight miles below Aberdeen, arriving there about 1 o'clock p. m., where she first let go of the Alcalde, and then placed the W. J. Patterson, which was a larger vessel, about three-quarters of a mile distant downstream, where she was safely anchored and remained during the prevailing storm, holding by one anchor with 70 fathoms of chain. The captain of the tug deemed the position of the Alcalde to be unsafe, being too near the mud flats at low tide. He therefore returned and took that vessel in tow, and moved her to what he deemed to be a better position, about the same distance from the Patterson as her first position, where her port anchor was dropped and 30 or 40 fathoms of chain paid out, and, as soon as the towline was released, the tug steamed away to Hoquiam, to wait until the next day, when, at the proper stage of the tide, she was to return to complete her contract by towing both vessels to sea.

The time of the second anchorage of the Alcalde was between 1:30 and 2 o'clock p. m., which was but a short time after the beginning of the ebb tide. The force of the wind was then in the same direction as the tide—that is, outward, towards the bar—and by the combined force of the wind and tide the Alcalde drifted by the W. J. Patterson, and continued drifting until she struck on the bar, and became a complete wreck. The Alcalde carried a port anchor, weighing about 1,400 pounds, and a starboard anchor, weighing 1,600 pounds, and a small kedge. There is no important contradiction or discrepancy in the testimony upon which the facts thus far recited have been established. As to other facts the evidence is conflicting, and my conclusions are based upon what I deem to be the preponderance of the evidence.

The place where the vessels were left by the tug is customary anchorage ground, and as good for the purpose as any part of Gray's

Harbor. The Alcalde's anchor chains were old, worn, and crystallized, and unfit for service as ground tackle for a vessel of her size. The testimony on the part of the libelants is to the effect that the Alcalde began to drift immediately after releasing the tug the second time; that she dragged her port anchor with 35 fathoms of chain until after she passed the Patterson; that it was unsafe to pay out more chain when she began to drift because of the danger of running afoul of that vessel; that, after passing the Patterson, she dropped her starboard anchor, and paid out 35 fathoms of chain, which broke as soon as that anchor took hold upon the bottom; that she then paid out more chain on the port anchor until about 55 fathoms in all had been paid out, when that chain also broke. I discredit all the testimony to the effect that the port anchor was dragged, and I am convinced that the vessel went adrift for the sole reason that each of her chains successively broke immediately upon being subjected to the strain of the vessel. My reasons for this conclusion are as follows:

(1) The chains were weak and incapable of standing a severe strain. Under the same conditions, one chain held a larger vessel near the place where the Alcalde started to drift, and it is a self-evident proposition that a good anchor with a sufficient length of good chain would have held the Alcalde also.

(2) The testimony of some of the libelants' witnesses is to the effect that the vessel was not held by her port anchor at all, but commenced to travel downstream as soon as she was released from the tug and continued going unchecked by her port anchor, until she had drifted two miles or more, when she came up on the chain with a jerk, and it then immediately parted, and that, while she was still dragging her port anchor, the starboard anchor was dropped; that the vessel pulled up on it with a jerk, and that chain immediately "snapped"; that she continued dragging the port anchor for an additional mile; that after breaking away from the starboard anchor she swung around, so that her stern came up into the wind, until she was athwart the current and had the wind abeam, and drifted broadside to both the current and the wind, and that she persisted in refusing to head up to the wind after the spanker had been set for the purpose of forcing her stern forward, so that her keel would be in line with the anchor and chain attached to her bow. This testimony is simply absurd, for, unless natural laws were suspended, if the vessel drifted broadside to both current and wind, there was no 1,400 pound anchor with 40 or more fathoms of chain pulling against her bow.

(3) The testimony given in behalf of the libelants by the mate of the Alcalde, although corroborating some of the absurdities sworn to by his associates, contradicts them in one important particular. He says that there was no jerk nor sudden strain upon either chain, but that each in succession parted under a steady strain. The most reasonable inference to be drawn from the circumstances is that the port anchor remained where it was dropped, as the starboard anchor did.

The unsuitableness of the anchor chains was a contributing, and the principal, cause of the loss of the vessel, and it is immaterial whether other faults on her part charged in respondent's answer are sustained or not sustained by the evidence.

On the other hand, the evidence convicts the steam tug of neglect of duty on her part, and the law requires the loss to be divided. After having undertaken to tow the Alcalde to sea, it was her duty to exercise ordinary care and vigilance for the safety of her tow until her contract had been completely performed. The Margaret, 94 U. S. 494, 24 L. Ed. 146.

There was negligence in her management and breach of duty on her part in two particulars: In the first place, the two schooners were not spaced with sufficient distance between them. In view of the warning of danger given by the increasing velocity of the wind on that day, ample room should have been allowed for paying out sufficient chain to afford the greatest security, but, on account of her position to the windward and upstream and the lack of sufficient distance between them, if the Alcalde had paid out as much chain as the W. J. Patterson did, a collision would have been almost inevitable. In the second place, the facts that the Alcalde's port anchor chain broke as soon as she began to pull on it, and that the tug did not render assistance when she commenced to drift, proves that she was left to her own resources with undue haste. In the condition of the weather then prevailing, the tug had no right to go away until after her tow had been securely anchored. Connolly v. Ross (D. C.) 11 Fed. 342; Hastorf v. Governor (D. C.) 77 Fed. 1000; Hughes v. Railroad Co. (D. C.) 93 Fed. 510; The Thomas Purcell, Jr., 92 Fed. 406, 34 C. C. A. 419; The American Eagle (D. C.) 54 Fed. 1010; The Snap (D. C.) 24 Fed. 510; The Battler (D. C.) 55 Fed. 1006.

The libelants contend that the tug was in fault for not proceeding to take the Alcalde directly to sea on the day of starting, notwithstanding the condition of the tide and the threatening weather. The most that can be said with regard to the argument on this point is that there was a possibility of success in such an undertaking. The captain of the tug, however, had a pilot's responsibility. He was required to act with discretion, and would have been responsible if a disaster had resulted from any lack of prudence in attempting to cross the bar under the conditions stated. Humbolt Lumber M'fg Ass'n v. Christopherson, 73 Fed. 239, 19 C. C. A. 481, 46 L. R. A. 264. His conduct must be judged by circumstances which necessarily had to be considered at the time, rather than by theories based upon after-acquired knowledge. I therefore acquit the respondent of all blame and responsibility in this particular, and I hold that it is liable for half the damages only, for the reasons above stated. I grant the respondent's request for leave to amend the answer by denying that the value of the Alcalde at the time of the loss was greater than $3,000, in order to have the benefit of that issue if desired in an appellate court. Notwithstanding the amendment, however, I find the value of the vessel with her equipment and stores to have been $10,000, and the value of the personal effects of Capt. Harris to have been $700, making the total loss $10,700 to be divided.

Accordingly, I direct that a decree be entered in favor of the libelants for $5,350, and that the total amount of taxable costs be divided equally.