### THE PRINTER.

(Circuit Court of Appeals, Ninth Circuit.    October 5, 1908.)

#### No. 1,550.

1. TOWAGE—DUTY OF TUG—ANCHORING OF TOW.

The duty of a tug to a tow is a continuous one from the time the service commences until it is completed, and where it becomes necessary to anchor the tow the tug's obligation of reasonable care continues, at least until she is safely anchored.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Towage, §§ 4, 23.]

2. SAME—LOSS OF TOW—INSUFFICIENT ANCHORAGE.

A tug, which had engaged to tow two schooners out of Gray's Harbor, after starting, anchored the tows to await a more favorable tide for crossing the bar, and then left them until the next day. The tide was ebb, and the wind strong from the east, and later increased. At once

one of the vessels commenced to drift; it appearing that the anchor chain parted. After she had drifted past the other vessel, she dropped another anchor, the chain of which also parted, and she drifted on the bar and was wrecked. On casting off the hawser at the anchorage the tug immediately left, without waiting to see whether the schooner's anchor held, and paid no further attention to her, although she made signals of distress before the tug was out of sight. *Held,* that the evidence supported a finding by the trial court that the schooner was in fault because of her defective anchor chains, and also that the tug was in fault in failing to stand by until the anchorage was seen to be safe, and that the damages were properly divided.

Appeal from the District Court of the United States for the Western Division of the Western District of Washington.

For opinion below, see 155 Fed. 441.

Austin E. Griffiths, for appellant.

H. W. Hutton and W. L. Sachse, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. The steam tug Printer, which for many years had been engaged in the business of towing in Gray's Harbor, Wash., undertook to tow the three-masted schooner Alcalde, together with the schooner W. J. Patterson, both loaded for sea, from Aberdeen outward across the bar to sea. The tug proceeded with the tows on her course toward the ocean, and at about 1 o'clock in the afternoon arrived at a point some eight miles below Aberdeen, where it was customary to anchor vessels to await time and tide for crossing the bar. The tide had then begun to ebb, and it was not deemed safe to cross the bar on the ebb tide. The tug directed the Alcalde to let go the tow line, put her helm to starboard, and anchor, which was done. The tug then placed the Patterson about three-quarters of a mile further down stream, and left her there at anchor. The captain of the tug, believing the Alcalde to be anchored too near the mud flats for safety, returned to that vessel, towed her to a better position, but at about the same distance from the Patterson as before, and directed her to let go the tow line, and anchor. The port anchor of the Alcalde was dropped, and about 30 or 40 fathoms of chain paid out. As soon as the tow line was let go, the tug steamed away to Hoquiam, intending to return on the following day and complete the contract by towing both vessels out to sea. The second anchorage of the Alcalde was made shortly before 2 o'clock. The ebb tide was then running with a considerable current. The weather was cloudy and wet, and a strong east wind was blowing. According to the reports from the weather station at North Head, 40 or 50 miles from Aberdeen, the velocity of the wind until 1 o'clock p. m. was from 16 to 21 miles per hour. During the afternoon it increased to 28 miles per hour, and continued to increase to 39 miles per hour at midnight; the highest velocity during the day being 44 miles. The force of the current and wind was such that immediately after she was anchored the Alcalde began to drift, and she continued to drift until she was wrecked on the bar. She carried a port anchor weighing about 1,400 pounds, a starboard anchor of about 1,600 pounds, and a kedge.

The only evidence as to the cause of her drifting and final wreck is that afforded by the officers and men of the Alcalde. Their evidence indicates that the port anchor, dropped at the time when the tug let go, never held, and that the vessel never fetched up; that they could not at first have dropped two anchors, for the reason that when the Alcalde commenced to drift she got close to the Patterson, and there was danger of her getting foul of that vessel, so that they were forced to let her drift by; that as soon as she got safely by the Patterson the Alcalde dropped her starboard anchor, and that after paying out about 40 fathoms on that anchor, the vessel still drifting, the chain of that anchor parted; that they then paid out up to 50 fathoms on the port anchor chain, and dropped the kedge anchor, connected with a 5-inch line; that the port anchor chain then parted; that the vessel had drifted about a mile when the first anchor chain broke, and about two miles when the second chain broke; that after the breaking of the second anchor chain they could still see the tug, and they hoisted the ensign Union down, as a distress signal, but the tug did not respond; that they then tried to make sail to force the vessel over the bar, but were unable to do so on account of the strong wind and the wet sails.

Upon a consideration of the evidence, the court below reached the conclusion that the port anchor was not dragged at all, and that the chain thereof parted as soon as the anchor took hold on the bottom, and that the vessel went adrift for the sole reason that each of her chains successively broke immediately on being subjected to the strain of the vessel. This conclusion was reached upon the testimony of some of the libelant's witnesses, to the effect that the vessel was not held by her port anchor at all, and, second, upon the evidence that the chains were weak and incapable of standing severe strain. Said the court:

"Under the same conditions, one chain held a larger vessel near the place where the Alcalde started to drift, and it is a self-evident proposition that a good anchor with a sufficient length of good chain would have held the Alcalde also."

The court held that the unsuitableness of the anchor chains was a contributing and the principal cause of the loss of the vessel, but held, also, that after having undertaken to tow the Alcalde to sea it was the duty of the tug to exercise ordinary care and vigilance for the safety of the tow until the contract was completely performed, and that the tug was negligent in not spacing the two schooners sufficiently far apart, and in not standing by and rendering assistance when the Alcalde commenced to drift, and in leaving her to her own resources with undue haste. Upon these considerations the court was of the opinion that the loss should be divided, and accordingly a decree was entered in favor of the libelants for one-half thereof, in the sum of $5,350, and directing that the taxable costs be divided equally. From that decree the claimants of the tug have appealed.

We find no ground to disturb the conclusion of the District Court that the tug was negligent in leaving the schooner with undue haste, and in not standing by to see that she was safely anchored. The preponderance of the evidence is that immediately after the tow line was

cast off the tug proceeded on her way, and all of the evidence is that after she started no one on board of her saw the schooner or ever looked in her direction. If any one on board the tug had looked, he must have observed that the Alcalde was drifting. If the Alcalde had been brought to on the tow line and held until her anchor took hold, it is probable that the anchor would have continued to hold. As it was, she was let go in a strong ebb tide, while a high wind was blowing in the direction of the current. It is obvious that, if she commenced to drift before her anchor held, her momentum must have been such as to put a greatly increased strain upon the chain whenever the anchor began to hold. The master of the tug undertook a certain towage service. He was prevented from the continuous performance of that service by the condition of the tide. But the duty of the tug to the schooner was a continuing one from the time when she was taken in tow until the completion of the towage contract. The tug's duty did not end with letting go the tow line at the anchorage grounds. Its obligation of reasonable care continued, at least until the schooner was safely anchored. Connolly v. Ross (D. C.) 11 Fed. 342; The Snap (D. C.) 24 Fed. 510; Hastorf v. The Governor (D. C.) 77 Fed. 1000; Hughes v. Railroad Co. (D. C.) 93 Fed. 310; The Thomas Purcell, Jr., 92 Fed. 406, 34 C. C. A. 419; The American Eagle (D. C.) 54 Fed. 1010; The Battler (D. C.) 55 Fed. 1006; Alaska Commercial Co. v. Williams, 128 Fed. 362, 63 C. C. A. 92; Brown et al. v. Cornell Steamboat Co. (D. C.) 110 Fed. 780.

In the case last cited a tug undertook to tow a scow, and left her at 6 p. m., promising to return the next day and resume the service. At the time when the scow was left, the weather was not considered so bad as to render it negligent to leave it where it was. Later it became worse; but the tug did not return to the scow to take it to a safer place, although she could readily have done so. The scow was not provided with an anchor, and during the night, after the storm had greatly increased, it broke from the scow to which it was fastened and drifted on the rocks. The court, in dividing the loss, held that the scow was in fault for not having an anchor, but that the tug was in charge of the scow from the time when it was taken from its moorings, and was charged with notice that it probably had no anchor, and with the duty of returning and taking it to a less dangerous place.

The appellees contend that upon the evidence taken in the court below as to the condition of the anchor chains on the Alcalde, aided by the new evidence on that subject taken in this court, it is shown that the chains were not defective, and that therefore the whole of the loss should fall upon the appellants. It is to be admitted that there is much in the evidence, especially in that which was last taken, to cast serious doubt upon the testimony that the chain links which were offered in evidence in the court below as samples of the anchor chain found on the wrecked vessel were portions of the anchor chains actually in use prior to the wreck. Considering the evidence as a whole, however, we are not convinced that the conclusion reached by the District Court was erroneous. We are much impressed by the fact, as found by the court, that the anchor chains parted under conditions in which, if they had

been sufficiently strong for the purpose for which they were used, they would have held the vessel.

The decree is affirmed, with costs to the appellees.