RONEY v. NEW YORK, S. & W. R. CO. et al.

(District Court, D. New Jersey. September 3, 1904.)

1. SHIPPING—INJURY OF SCHOONER BY FLOATING ICE—NEGLIGENT ANCHORING BY DOCK OWNER.

Libelant's schooner, after lying for 10 days at respondent's docks, on the New Jersey side of the Hudson river, waiting to be loaded with coal, was finally loaded on Saturday night, and on Sunday morning, after the loading was completed, respondent had her towed out into the river and anchored. It was very cold, and the river was filled with floating ice, which at that time had been driven by the wind to the eastern side. Sunday evening the wind changed, and the ice was driven down stream against the schooner, causing her to drag her anchor and drift for two miles during the night, and inflicting such injury that it was necessary to unload and dock her for repairs. Libelant, who was master, was at the docks on Saturday, but could not learn when the vessel would be loaded,

---

¶ 1. Loss or damage by perils of the sea, see note to The Dunbritton, 19 C. C. A. 465.

132 F.—21

and was absent that night, returning Sunday, when, finding his vessel in the stream, he protested, and asked that she be returned to a place of safety, and, this not being done by respondent, he endeavored to procure a tug, but could not, owing to its being Sunday. There were only two men on the schooner, who were unable to navigate her or raise the anchor, nor would it have been safe to attempt to navigate her without a tug. *Held,* that respondent was chargeable with negligence which rendered it liable for the resulting damages; no contributory fault being shown on the part of libelant.

In Admiralty.

Hyland & Zabriskie, for libelant.

Collins & Corbin, for respondents.

LANNING, District Judge. On January 7, 1903, the schooner Harry Landell arrived at the coal docks at Edgewater, N. J., on the western shore of the Hudson river, for a cargo of coal to be delivered at Groton, Conn. She was tied up at the docks on the lower side of pier No. 2, waiting for her load, until Saturday, January 17th. About 5 o'clock on the afternoon of that day she was taken across the slip, about 100 feet in width, from the lower side of pier No. 2 to the outermost chute but one on the upper side of pier No. 1. The loading of the schooner was immediately commenced, and it was finished about 9 o'clock the next (Sunday) morning. The docks are in possession and control of the New York, Susquehanna & Western Railroad Company. About 10 o'clock Sunday morning the railroad company employed the steam tug Lyndhurst to tow the loaded schooner away from the docks and into the Hudson river. She was taken out some 200 or 300 yards from the New Jersey shore and anchored there. The weather was very cold, and there was much ice in the river, although at the time of the removing of the schooner the most of the ice, by reason of a northwest wind then prevailing, had been driven toward the New York shore, and there were no great accumulations of ice in the part of the river where the schooner was anchored. She lay at anchor during that day, but about 8 o'clock in the evening, the wind having shifted to the north and the river having filled with ice around her, she began to leak and to drag her anchor. During the night she drifted down the river some two miles, until her anchor caught fast in one of the submarine pipes of the Standard Oil Company. On Monday morning two tugs of that company towed her up the river to the flats above the coal docks, where, on account of her sinking condition, she was beached. Her cargo was then removed, the leaks stopped, the water pumped out of her, and she was taken to a dry dock for repairs. The injury to her was caused by the pounding of the ice. This action is brought against both the railroad company and the Lyndhurst, for the recovery of damages thus sustained by the libelant.

The libelant charges that the respondents were particularly at fault in taking the schooner into the river while there was solid and floating ice there, or danger to be apprehended from the same, and against the objections and protests of the schooner's mate, who was then in charge of her, and in making no efforts to take her to a

place of safety after she had been left in the river. A recovery by the libelant must depend upon whether, by a fair preponderance of evidence, he has shown negligence on the part of the respondents, or either of them, which was the proximate cause of the damage. He claims to have shown such negligence. The respondent, the railroad company, which assumes the burden of the defense, insists, first, that no negligence, either on its part or on the part of the Lyndhurst, has been shown, and, second, that, if such negligence has been proven, still the libelant himself was also negligent, and that the damages sustained by him should be apportioned between the libelant and the respondents.

It is clear, I think, that the schooner received little, if any, injury before the latter part of Sunday. The evidence satisfies me, however, that the vessel could not have been left there without apprehension of grave danger. The fact is that in the afternoon the wind shifted from the northwest to the north, the ice began to run down the river and to spread across it from the New York shore, and to pound the vessel, and by 8 o'clock in the evening she was leaking, dragging her anchor, and drifting helplessly down the stream. The change of the wind and the filling of the river with ice should have been apprehended. Plainly, it should not have been deemed prudent to leave the schooner where she was anchored, unless, indeed, the respondents had reason to believe that she would be speedily removed to a place of safety. They had no such reason. The schooner required a crew of five men to sail her. There were but two, the mate and the cook, on board when she was removed. The master, who is also the owner of the vessel and the libelant in this case, resided in New York City. He had visited the docks every day while his schooner lay there to learn when she would be loaded. On Saturday afternoon, January 17th, he called and was informed that the prospects for loading were somewhat brighter; but he received no intimation that the loading would be done that night. At the end of the preceding trip with his vessel he had paid his crew their wages and discharged them. He had afterwards taken on the cook and the mate, who were aboard the vessel when she was removed from the docks. He says, and he is not contradicted, that it is customary for schooners to discharge their crews when a voyage or trip is completed, and not to retain them while waiting in port for a load. He says no schooner does otherwise, and that a new crew can usually be secured in a couple of hours. On Sunday morning, as he was crossing the river from New York to Edgewater, he saw his schooner being towed into the river. He went at once to the coal office at the docks, and there protested against putting the vessel into stream "this icy time," and asked the men in charge of the office to have her brought in again to the docks. His request not being complied with, though it does not appear that it was expressly denied, he went to look for the Lyndhurst or some other tug, to take her to a place of safety. He saw the Lyndhurst, he says, out of hailing distance, going down the river with a scow or canal boat. No other tug was in sight. He then returned to New York, and went to the office of the Kennedy

Towing Company, with whom he had a contract for the furnishing of a tug to take his schooner, when loaded, through Hell Gate to the entrance of Long Island Sound. The office was closed. He found the offices of the White Star Line and the Red Star Line also closed. He made other unavailing efforts to get a tug. He further says that the mate, the cook, and himself could not have sailed the vessel, for the reason that three men could neither heave the anchor nor lift the frozen sails.

But the respondents insist that the mate of the schooner consented to be taken into the river, and that they are thereby relieved of liability for the ensuing damage. I have already stated that the libelant protested against the act of the respondents, and asked to have the schooner returned to the docks. I am further satisfied, though the testimony on the point is conflicting, that the mate of the schooner, when the order was given to remove her, not only did not consent to the removal, but that he, not very vigorously, but still sufficiently, objected to it. The respondents also insist that there was no room for the schooner at the docks after she was loaded, and that they were not bound to await the convenience of the libelant before taking the vessel into the river. Even if the libelant had not used due diligence in providing a crew or a tug for the schooner, the respondents were not at liberty to take her to a place of danger and then abandon her. If there was no room for her at the docks, they should have removed her to a place of safety.

The respondents insist again that, if the schooner had been provided with a proper crew, she could have sailed down the river, without the aid of a tug, to the Jersey Flats and found there a safe anchorage ground. To substantiate this claim, they rely on the testimony of Ralph Timmans, captain of a steamboat, John M. Cherry, superintendent of the floating equipment of the Erie Railroad Company, and Thomas B. Luther, a boatman, all of whom were called as witnesses for the respondents. On cross-examination Capt. Timmans was asked if he had ever seen vessels of the size of the libelant's schooner sail down the river in winter when there was ice in the river. His reply was: "Well, I don't recall just when there was ice in the river." Superintendent Cherry was asked on direct examination: "With a west wind, could a vessel of the size of the Harry Landell sail down the river to the Jersey Flats, even with ice in the river?" His answer was: "Not with ice." And Boatman Luther was asked on direct examination: "Which is the more frequent, to sail or to tow, as far as you have observed?" And he replied: "About as frequent to sail as to tow, otherwise than bad weather or ice, and then they tow." Such testimony, added to that on the same subject by the witnesses called by the libelant, makes it clear that, even if the libelant's schooner had been fully manned, it would not have been deemed wise to attempt to sail down the river. The Jersey Flats were several miles below the Edgewater docks, and the condition of the river, neither at that place nor on the way down, was known. Notwithstanding the facts that the weather was extremely cold, that the wind might change at any hour and the river fill with ice, that the schooner had an in-

sufficient force of men to man her, that the employment of a tug on Sunday to take her to a place of safety was more difficult than on other days of the week, and that it would have been unwise to attempt to sail her down the river, the vessel was towed into the river and there left to care for herself. Applying to this case the rule followed in Cokeley v. The Snap (D. C.) 24 Fed. 504, Hastorf v. The Governor (D. C.) 77 Fed. 1000, and Phœnix Towing Co. v. City of New York (D. C.) 60 Fed. 1019, I conclude that the act of the respondents was culpable abandonment.

The charge of the respondents that the libelant himself was negligent is based on the allegations that no request was made of the tug Lyndhurst to move the schooner after she had been taken into the stream, that the libelant failed to make reasonable provision for a tug, and that the schooner should have sailed down the river to a safe anchorage. These allegations have already been considered. By a fair preponderance of evidence they are all disproven. It is therefore unnecessary to consider the rule in admiralty for the apportionment of damages when both libelant and respondent are guilty of negligence, expounded in the case of The Max Morris, 137 U. S. 1, 11 Sup. Ct. 29, 34 L. Ed. 586.

There will be a decree for the libelant, with costs.