## THE TEDDY ROOSEVELT.

(District Court, D. Oregon. December 4, 1911.)

No. 5,161.

1. TOWAGE (§ 11*)—CARE AND SKILL REQUIRED—INJURY TO TOW.

   A towing vessel is required to exercise reasonable care, caution, and maritime skill, and if these are neglected, and injury results to the tow, she is liable therefor.

   [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

2. TOWAGE (§ 11*)—INJURY TO TOW—LIABILITY OF TOWING VESSEL.

   A launch *held* liable for injury to a scow with a pile driver mounted thereon, which she contracted to tow up the Columbia river, but being unable to make the port of destination because of an adverse wind left at a wharf on the north side of the river which at that season of the year was an unsafe place because exposed to sudden storms, one of which caused the scow to break from its moorings and to capsize by reason of which it suffered injury.

   [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

In Admiralty. Suit by Leander Lebeck, as owner of a scow, against the launch Teddy Roosevelt. Decree for libelant.

A. E. Clark and Harrison Allen, for libelant.

C. W. Fulton, for respondent.

WOLVERTON, District Judge. This is a libel to recover damages for injuries alleged to have been sustained by a scow rigged as a pile driver. Libelant charges that he made a contract with Capt. Sigurdson, master and owner of the launch Teddy Roosevelt, to tow the scow, of which libelant was the owner, from Astoria to Skamokawa, for a consideration of $15. He testifies, in effect, concerning the contract, that he met Capt. Sigurdson on the 17th of October, in Astoria, and that some conversation arose in which Lebeck stated that he wanted to get the Callendar Company to tow the scow to Skamokawa, as he desired to use it there on Monday; that Sigurdson then solicited Lebeck to allow him to tow the boat, and offered to take it for $17.50; Lebeck replied that he thought he might as well get the Callendar Company to do it, although he would have to pay a little more for the service; thereupon Sigurdson said he would tow the boat to the place designated for $15, and the offer was accepted by Lebeck. Sigurdson denies that the arrangement for towage was as stated by Lebeck. He testifies, in effect, that Lebeck approached him, and told him of his desire to have the scow with the pile driver at Skamokawa

---

on Monday morning, and urged him to tow it up for him; that he told Lebeck he had regular trips to make on the river, which he did every day in the week except Sunday, and that he could not tow the boat on that account, unless he could do it the following day (being Sunday) and return in time to reach Warrenton so as to start upon his regular trip on Monday morning; that he finally told Lebeck he would undertake the service, but that, if he was unable to reach Skamokawa before the tide turned, he would have to return, because he would not be able to tow the scow against the tide. Sigurdson says:

"I told him (Lebeck) I would have to leave it; I would have to leave it anchored or wherever I was if the tide turned. I knew I could not tow it against the tide."

He was then asked what Lebeck said, and answered further:

"He wouldn't say anything direct, except he was positive I could do it, and at last I told him, 'Well, I will be there at 1 o'clock Sunday, and do the best I can.' And he answered that if I got it to Skamokawa, he would pay me $15."

Then he was asked, "If you got it up there, he was to pay you $15?" to which he answered:

"If I got it up there he would pay me $15. If I didn't get it there, I didn't intend to claim anything. I took a gamble getting it there on one tide or not."

Such, in substance, is the contract under which Sigurdson claims he undertook to do the service. The question arises as between these two witnesses (there being no others present), Whose version delineates the real contract?

The libelant has the burden of proof to establish the allegations of the libel, and therefore he must prove the contract relied upon for recovery. I am impressed, however, that the better reason of the situation, considering all the testimony in the case, and the attending circumstances, favors libelant's version or understanding as to what the contract really was.

The tide was expected to be running in at about 1 o'clock, and would continue up until near 7, and it was supposed that the service could be performed easily within the time. It turned out, however, that the tide was very low, it being a neap tide, and that the current was not as strong as it was expected to be. Skamokawa is situated on the north side of the river from Astoria, and about 21 miles distant. Capt. Sigurdson took the tow in charge about 1 o'clock, or a little later, in the afternoon of Sunday, at Astoria, and started upon his way. About 3:30 o'clock he encountered an easterly wind blowing so as to impede his progress with the tow. The wind seemed to increase in velocity until it became very difficult to tow the boat further. At about this time they reached Altoona, which is on the north side of the river, distant from Astoria about 12 miles, and in a north-easterly direction. He thereupon tied the scow up to the wharf at Altoona, and returned to Astoria. He arrived back about 7 o'clock, and about 9 or later notified Lebeck of what he had done with the scow. Considering the fact that Lebeck wanted his pile driver in

Skamokawa on Monday morning for service, and that it was supposed the trip could be made on the tide without trouble, it is more reasonable to conclude that a positive contract was made for the towing through at the price agreed upon, and that there were no such conditions attending it as are claimed by Capt. Sigurdson. The further question, therefore, arises as to whether Capt. Sigurdson disposed of the tow, when he found he could not carry it further, with reasonable judgment, such as relieved him of liability for injury sustained. I should have stated previously that, during the night or early morning of the next day, a severe storm came up from the southwest, the wind blowing almost a gale, and causing the scow to break loose from its moorings, and to drift against another dock, where it was injured so that it leaked by the stern, and capsized, breaking the jens of the pile driver, while Lebeck and the men with him were attempting to haul it away so as to make it fast to a dolphin near by.

The evidence shows, without much contradiction, that Altoona is greatly exposed to the weather, and is not a safe place at which to tie up a scow of that character. It is subject to northwesterly and southwesterly winds, which at that time of the year (October) are liable to spring up suddenly, and at almost any time. Witnesses testify that storms are not so likely to occur in October as later in the season, but none of them deny that they may be expected in that month, and to arise without premonition or warning. Capt. Sigurdson testifies that he made the boat fast at the wharf by a line at the stern and one at the bow, leaving the lines slack so that the boat would adapt itself to the action of the waves. He further testifies that he used lines that were found on the boat, being 3½ to 4½ inch lines: that is, by the circumference. Lebeck testifies that he told Sigurdson he would leave on the boat for his use a new 4½-inch hammer line, and two other witnesses testify that the line was left, as Lebeck indicated it would be. This line was found on the boat the next day unused. Seamen who were witnesses for the respondent seemed to be of the opinion that when Capt. Sigurdson found he could not go further, there was left for him but one thing to do, other than to tie the boat up as he did, namely, to return with it to Astoria. This could have been safely done, as the wind was from the east and the tide would soon be in Sigurdson's favor. One of the witnesses seemed to think that it would be difficult to make the run in the dark, but he was not corroborated in this by others.

[1] The obligation resting upon a mariner attempting to tow a boat is not that of a common carrier, but it requires on the part of the person engaged in the service the exercise of reasonable care, caution, and maritime skill. If these are neglected and disaster occurs, the boat engaged in the service of towing will be liable for the consequences. The Steamer Syracuse, 12 Wall. 167, 171, 20 L. Ed. 382; The American Eagle (D. C.) 54 Fed. 1010. The highest degree of skill and care is not required, but such as prudent navigators will employ in a similar service. 28 Am. & Eng. Enc. of Law, 262.

[2] I am of the opinion that Capt. Sigurdson did not use that de-

gree of skill and care that the careful navigator would observe in preventing injury to the boat and tow. There was probably but one thing for him to do when he found he could not take the tow further on that occasion. Knowing, as he ought to have known, and as mariners plying the waters about Altoona know, that it was unsafe to tie a scow rigged as a pile driver at a wharf or dock at that place at that season of the year, he should have turned back, and taken it to the place at which he found it. By not observing this precaution, he is rendered liable for such damage as was sustained on account of the scow breaking from its moorings and being injured through capsizing. This conclusion is borne out by the cases. Cokeley v. The Snap (D. C.) 24 Fed. 504; The American Eagle, supra; The Governor (D. C.) 77 Fed. 1000.

The amount sought to be recovered is $933.50. Among the items upon which recovery is claimed is to be found one for cost of new jens for driver $430, and another for loss of tools not recovered, $150. These items I deem to be largely in excess of the real cost of restoring the jens and the tools. The libelant in his testimony claims for lumber with which to repair the jens 5,500 feet at $46 per thousand, and for labor in the amount of $207. I think the price demanded for the lumber is exorbitant. Two sticks 60 feet in length were required with which to reconstruct the jens. These were dressed, and it is possible they cost at the rate of $46 per thousand. But there were 2,000 feet of timbers otherwise used, and it does not seem to me their value was to exceed $15 per thousand. Hence I deduct from the item of lumber $62. It also seems to me that the jens could have been reconstructed with a great deal less labor than is claimed, namely, about one-fourth thereof; hence I will allow $57 for labor, making a total reduction of $182 from the estimated amount for the jens named in the statement. Though libelant attempted to give the items of tools lost when testifying, no statement thereof was rendered in writing to the respondent. By a careful calculation according to libelant's own estimates, the tools lost were of the value of $107. This was based upon the first cost. I think this is more than the tools were worth, and I therefore allow $75 for the tools lost instead of $150. Deducting these items aggregating $257 from the amount claimed, namely, $933.50, leaves $676.50, which the libelant is entitled to recover.

Decree will be entered accordingly.