### THE WINTHROP.

(Circuit Court of Appeals, Second Circuit. December 15, 1920.)

No. 84.

Towage &⇒11(10)—Tug not liable for mooring barge overnight in sheltered spot.

Where a tug was unable to complete a trip before night, and moored the barge in a sheltered spot, and proceeded on its way, intending to return in the morning, *held*, there was no negligence, rendering tug liable for the loss of the barge's anchor, when an ice floe unexpectedly swept it from its mooring during the night.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by McWilliams Bros., Incorporated, against the steam tug Winthrop, her engines, etc.; the Staples Transportation Company, claimant. Decree for claimant, and libelant appeals. Affirmed.

&⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Herbert Green, of New York City, for appellant.

Harrington, Bigham & Englar, of New York City (L. J. Matteson, of New York City, of counsel), for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The barge Liberty, a wooden vessel of 1,586 registered tons, length 246 feet, and beam 43 feet, drawing about 19½ feet, with a cargo of 28 tons, consigned to the New York, New Haven & Hartford Railroad at Providence, was towed by the steam tug Winthrop on the afternoon of February 15, 1920, on the voyage to Providence. After being taken in tow at Newport, the tug proceeded to Providence. The barge was towing with a hawser of about 50 fathoms. At about 6 o'clock in the evening, the barge was anchored pursuant to the orders of the tug master, and the tug went on to Fall River. Later the man on the barge hauled the hawser in. The anchor was dropped at about 30 fathoms of chain. The night was dark, the wind was light from the northwest. A watch was kept during the night and about 12:30 a. m. ice was observed coming down. The northwest wind had increased to about 25 miles an hour, and this brought the ice striking the barge across her bow, causing the barge to drag, and thereupon the captain let out more chain; but she kept on dragging, and finally packed-up ice created such a strain on the chain that it parted. This floe came from the direction of Providence and proved to be the width of the stream. A spare anchor was put out, weighing amout 4,500 pounds; but the barge was caught in the floe and kept going down stream until the ends of the floe caught and the floe was held stationary. When the tug returned the next morning, the ice pack was found as described; but the tug succeeded in making her way to the barge, using a passage which a naval vessel from the government station had broken. The result was, the Liberty lost her anchor, and seeks to recover $2,314.78 for such loss. The barge was thereafter towed to her destination. When anchor was dropped by the barge, she had reached Hog Island, and she was on an anchorage ground much used. The captain of the tug then proceeded to Fall River, where he remained for the night. He stated that he left the barge overnight at this anchorage because he had run over his time and that he was only allowed 13 hours a day, and said that, if he had gone to Providence, he would have run over his time and the inspectors "would have been after me." It appears from his statement that his 13 hours would have expired at 8 o'clock, and this was not sufficient time for the vessel to make the point of destination of the barge. Further, he says that the safety of towing the barge through the narrow channel to Providence and at night was influential in causing him to direct the anchoring of the barge as he did.

The contention of the libelant is that the loss of the anchor was caused by anchoring the barge in an unsafe place and in not proceeding to Providence the same evening. On the other hand, the appellee contends that the anchorage grounds used were well known, and that it was customary to anchor barges under conditions similar to those that obtained that night; that there was nothing in the condition of the

water or tide which indicated danger of an ice floe, and that therefore there was no negligence in the navigation.

There are some physical conditions about the spot where the Liberty was anchored which make good the claim of the appellee that it was a sheltered spot. Upon the chart, the place of anchorage is given as about a quarter of a mile above Sandy Point light on Prudence Island and a few hundred yards from the shore. The point is below the junction of the narrow channels which lead from the eastern passage northeasterly to Fall River, and northwesterly to Providence. This spot is perhaps a mile of navigable water between sharply descending shores of Prudence Island and Rhode Island. The water extends in width from the buoy above Coggeshell Point about a mile and three-quarters northerly to the buoy below Hog Island, and to the east of Hog Island is the narrow channel to Providence about 300 yards wide. On the west of Hog Island is the entrance to Providence Bay, about three-fourths of a mile wide. The barge was anchored well below the entrance to Providence Bay, which is sheltered on the west and northwest by Prudence Island, with heights rising to about 160 feet; on the east by Rhode Island, with heights of about 180 feet. On the north there is a shelter from Bristol Hook and Hog Island, and on the south by Dyer Island.

A vessel of the size indicated by the foregoing description indicates a sea-going craft capable of weathering any ordinary weather conditions. To anchor a vessel of this type in such a spot would indicate sufficient caution on the part of the navigator. It appears to have been a customary practice by other careful and prudent navigators to do so. Nor was there anything in the weather conditions which indicated that danger of an ice floe should have been anticipated. There was no wind, or any indication of any, at the time the barge was anchored, and the fact is that the wind which did come up later was of but 25 miles an hour. Although there were frozen waters for a few days before, the evidence indicates that the ice was thoroughly broken up, and about the anchorage grounds there was no ice. It further appears that, during the trip from Newport to Hog Island, no large floes of ice were encountered, and a vessel of this type should have been able, under ordinary circumstances, to withstand ordinary floating ice. For the master to have done, on this occasion, what he had done on many other occasions before, and what other barge captains before him did with safety, was all that could be expected of a reasonably prudent navigator. He exercised his best judgment, and there is no reason why, at the time he directed anchoring the vessel, he committed a negligent act. Nor do the authorities relied upon by the appellant, when applied, impose a liability here.

In The Thomas Purcell, 92 Fed. 406, 34 C. C. A. 419, the court found that it was not customary for boats to anchor off Stamford in stormy weather, and that when a barge was anchored with a storm threatening, the tug ignored the danger immediately at hand, which could and should have been avoided.

In Teddy Roosevelt (D. C.) 192 Fed. 997, a pile driver mounted on a scow was moored at the end of a pier under weather conditions

which indicated that a storm was to be anticipated. The storm came, as indications pointed it would, and the damage to the barge was sustained.

In Roney v. N. Y. Susquehanna R. (D. C.) 132 Fed. 321, a small schooner was anchored off Edgewater when large quantities of ice were plainly to be seen in the river. The ice was driven from the New York shore by a northwest wind, which should have been known might result in driving the ice against the schooner.

A mere mistake of judgment is not enough to impose liability upon the owner of the tug. The tug master must use reasonable skill and judgment, and the tug owners are liable for damages sustained through his failure to possess or exert these qualities. Inability to cope with an emergency which could not ordinarily be anticipated will not impose liability. The Battler, 72 Fed. 537, 19 C. C. A. 6. The tug master exercises ordinary skill and care if he anchors when there is no reason to apprehend danger and displays reasonable skill and judgment in arriving at this determination. McWilliams v. Phila. & Reading R. Co., 203 Fed. 859, 122 C. C. A. 84; The Willie, 184 Fed. 279, 106 C. C. A. 421.

The evidence here warranted the conclusion below that the master of the tug was a competent man of long experience, and that he had no reason to anticipate the unusual floe of ice which occurred on the night in question, and which came down the channel intact, striking the barge, and carrying the barge with it.

We find nothing in the evidence which condemns his care of the barge, and the decree is therefore affirmed.