# PUGET SOUND COMMERCIAL COMPANY *v.* INTER-ISLAND STEAM NAVIGATION COMPANY, LIMITED.

## September 18, 1914.

1. *Admiralty—Evidence of position of a ship under way—Position in relation to line to landmark—Distance:* The testimony of a witness as to the position of a ship under way, in relation to a line from the witness to a conspicuous landmark, is more reliable than his estimate of the distance of such object from himself.

2. *Same—Two witnesses observing vessel from different points—Landmarks—Intersection of lines of direction to landmarks:* Where two witnesses, observing a vessel under way from different standpoints, testify that her position at a particular time is on lines from their respective standpoints to conspicuous landmarks, which lines cross each other, such point of crossing fixes the position of the vessel and, coming from credible witnesses, may be regarded as conclusive.

3. *Same—Towing sailing vessel—Safe offing—Res ipsa loquitur:* A sailing vessel without cargo or ballast was towed out to sea and let go by the tug before her crew had completed setting her sails. They had the heavy hawser to take in, the wind being baffling and changeable, and the sea against her; she attempted to gain the open sea,

tacking several times to port and starboard but losing for the most part, and finally going ashore and becoming a total loss. *Held* that the doctrine of *res ipsa loquitur* applied, and the result showing that she was left in an unsafe place,—unless it should appear that the loss was due either to the fault of those on board or to inevitable accident.

4. *Same—Same—Responsibility of master after being let go:* Under such circumstances the master was justified in persisting in the attempt to make the open sea up to the point where such persistence would expose his ship to obvious danger. At such point he had a good opportunity of giving up such attempt and running in to a safe anchorage. *Held* that he should have made the most of such opportunity, and failing to do so made the owner liable, partially at least, for her subsequent loss.

5. *Same—Liability of tug for failure to give tow safe offing and subsequent assistance, and of tow for failure of good judgment and seamanship:* *Held,* in view of the negligence of the tug in letting go of such vessel in an unsafe place, and her neglect to render assistance, when it became evident that she was losing ground and approaching danger in her attempt to gain the open sea, and of the failure of the master of such vessel to exercise good judgment and seamanship at such juncture, that both the owner of the tug and the owner of the sailing vessel were jointly liable for her subsequent loss.

*In Admiralty:* Libel for damages for negligence in towing.

J. W. Russell (*Thompson, Wilder, Watson & Lymer* with him) for libelant.

L. J. Warren (*Smith, Warren, Hemenway & Sutton* with him) for libellee.

DOLE, J. It is admitted that both the libelant and libellee are corporations. It is claimed by the libelant in both the count in tort and the count in contract, that the master of the libelant engaged the master of the steamship Keauhou, belonging to the libellee, on the 9th of November, 1912, to tow the Klikitat, a barkentine, out of Hilo harbor, to a safe offing and until ready to proceed with her own sails; that, pursuant to such agreement, the Keauhou

towed the Klikitat out of Hilo harbor and cast off the tow-line before the Klikitat had been towed out sufficiently clear of the land to afford her a good and safe offing and before she had an opportunity to set sail, leaving her in a dangerous position within about half a mile from the rocks, and that in consequence of being left in such a position she went ashore and was so damaged as to be valueless; that while the Klikitat was in a position of danger the Keau-hou could have rescued her by the exercise of ordinary effort, but negligently failed to do anything in the way of assistance; that such injury was due solely to the negli-gence of the libellee and its agents, and that libelant and those on board the Klikitat were free from any fault or carelessness contributing thereto.

The libelee admits the towing engagement to the extent of agreeing to tow the Klikitat sufficiently clear of the land to afford her a good and safe offing, but denies that there was any stipulation in relation thereto that libellee should continue to tow her until she should be ready to proceed under her own sails, except as such a condition might be implied in any case of the towing of a vessel to sea for the purpose of taking her to a point sufficiently safe and distant from land, whence she could safely proceed under her own sails if handled in the usual and seaman-like manner; but alleges that the Keauhou towed the Klikitat in a north-easterly direction from the whistling buoy, at the entrance of Hilo harbor, to a point approximately three miles or more northeast of the whistling buoy and there released her, having given notice of intention to do so by blowing the steam whistle and slowing down; that the Klikitat then had practically all her sails set, and then and for some time theretofore had good steerage way and was drawing well away on her towline under a fresh breeze and was ready to proceed and did proceed on her voyage. And it denies that the wreck of the Klikitat was due to her being cast off by the Keauhou as aforesaid or as claimed. Libellee

further denies that while the Klikitat was in a position of danger the Keauhou could, by the exercise of any ordinary effort, have saved her from destruction, and denies that the Keauhou carelessly or negligently omitted to render such assistance, and alleges that at no time except during the few minutes before said Klikitat went ashore did it appear to the Keauhou or any persons on board that the Klikitat was in a position of danger, she being at all times apparently under full control and having at all times when near shore and until a few minutes before going ashore, been over safe anchorage ground; that at all the times when the "Klikitat approached nearer land she was sailing well in a safe and free course to sail directly back into Hilo harbor, and to the observation of those on board the Keauhou, such appeared to have been her intention"; that such return could well have been effected at any time, or the Klikitat could have dropped her anchor and rode safely at anchor at any time, and no danger could have been apprehended by the servants of the libellee in time for them to have rendered assistance. Libellee further alleges that the loss of the Klikitat was due solely to the negligence and want of ordinary care and seamanship on the part of those on board, and that libellee and its agents were free from any fault or negligence contributing to such loss. The claim of the libelant as to the value of the Klikitat in the sum of ten thousand dollars, is denied by the libellee.

It is satisfactorily shown that early in the afternoon of the 9th of November, 1912, the Keauhou proceeded to tow the Klikitat out of Hilo harbor and that the time consumed in the towing was approximately 50 minutes; that the time consumed after passing the whistling buoy to the time the hawser was cast off was approximately 40 minutes; that from the start of the tow the crew of the Klikitat proceeded to set up their sails, and that at the time the hawser was cast off she was on the starboard tack with the fore-and-aft sails set, also one of the squaresails on the foremast.

Upon being cast off the crew of the Klikitat with a donkey engine, tried to take in the hawser and, finding it slow work, abandoned it for the time being in order to finish setting sail. With the light winds then prevailing it appeared to be impracticable for the Klikitat to tack, such movement being desirable because she was not heading clear of Pepeekeo point which was off her port bow, and the master decided to wear ship which took considerable time, and he came up into the wind at a place perhaps slightly more favorable for proceeding to sea. About this time the hawser was cut. It is not clear to me whether it was cut before or after the vessel wore around; the probabilities are that it was before. From then on the Klikitat beat back and forth in her attempt to gain the open sea, going to leeward and toward the shore all the time. She was finally close to the shore in the neighborhood of the place where she went ashore, still apparently trying to get out to sea. The wind was variable, swinging from easterly to northeast to north and to the west of north, blowing in squalls, with calms between. I judge that the wind was generally favorable for the return to the harbor if the master of the Klikitat had so desired; but he continued his efforts to put out to sea, losing with every tack, until finally, when perhaps he was trying to return to the harbor, there was a calm during which he dropped anchor and then was struck by a considerable squall with his sails aback; the anchor failed to hold and he was swept ashore.

The libelant's witnesses substantially agree in fixing the place where the towline was cast off at a point less than a mile from the whistling buoy and less than a mile from the shore. This, I think, is not borne out by the evidence in the case and the circumstances existing at the time. The captain of the Klikitat allows 50 minutes as the time consumed in the tow. As the distance from the start to the whistling buoy is about a mile or a little more, the distance beyond the whistling buoy of less than a mile would make

an aggregate distance for the tow of approximately two miles, and it is difficult to account for the tow's consuming 50 minutes and going only about two miles although witnesses for libelant state that the two proceeded slowly, sometimes almost stopping during squalls.

Mr. Brigham, who testified for the libellee, was so far as appears, an entirely disinterested witness. He observed the movements of the tow and of the Klikitat after being cast off, from the window of his office at the shore end of the breakwater. He was interested in making a close observation of these movements from the fact that he was building a tug for the work of the breakwater, with which he expected to do some towing in the harbor of Hilo; and, as this was the first tow he had seen there, he was anxious to see how it worked and to asertain whether the tug he was building and had designed would answer the same purpose. In watching the progress of the tow, he took the line from his position to Pepeekeo point as the line from which to offset the movements of the tow and Klikitat after she was cast off. He found that the Klikatat was cast off almost exactly on this line, and fixes her position on the map, exhibit A, when cast off at a point three miles from the whistling buoy and one and six-tenths miles from the Papaikou mill. He stated that upon being cast off the Klikitat was sailing on the starboard tack inshore; then she wore ship and came around to the port tack and went offshore a short distance to a point a little outside of the line mentioned, marked on the map, exhibit A, "TWB 5", at which point the Klikitat went about and came inshore to "TWB 6", during which movement more sails were set.

Mr. Drummond, a witness for the libellee, observed the Klikitat from the same point that Brigham had been looking from. He says, "My attention was called to her being out there and I took a look at her; she was quite a distance off to the right of the line between the breakwater and Pepeekeo point, probably a quarter of a mile." He marked

the place as "1" on exhibit 4. He further said that he did
not see a tug near the Klikitat or any other vessel outside
the harbor besides the Klikitat. This corresponds with the
position fixed by Brigham at "TWB 5", as the outward
point from said line, reached by the Klikitat after wearing
ship for the first time or with "TWB 7", the second point
reached by the Klikitat outside of such line.

[1] Capt. Bruhn said that "as we passed the Klikitat on
our return, the whistling buoy was pretty near in line with
Pueo." The testimony of the witnesses as to positions
based on conspicuous landmarks, is more reliable than their
estimates of distances, especially as to distances from the
witness in a direct line away. I therefore recognize Capt.
Bruhn's statement of his alignment with the whistling
buoy and Pueo, and also Mr. Brigham's conclusion as to
the place where the tow was cast off as aligned with his
point of view and Pepeekeo point, as reliable. Adjusting
these two estimates, the place at which the hawser was cast
off must be nearer to Mr. Brigham than he estimated it.
This point is on a line between Mr. Brigham's point of
observation and Pepeekeo point and also near a line with
the whistling buoy and Pueo. Mr. Brigham's testimony
as to the position of the tow at the point the hawser was
cast off as on a line between him and Pepeekeo point, is
more to be relied on than Capt. Bruhn's testimony as to the
distance he towed the Klikitat from the whistling buoy,
and must fix the place where the tow was cast off at a point
approximately near where a line from Pueo through the
whistling buoy would cut the line from Brigham's office
to Pepeekeo point. This place, however, must be farther
north than that point for the reason that Bruhn noticed
that "as we passed the Klikitat on our return the whistling
buoy was pretty near in line with Pueo", which means that,
as the turn was made to starboard, the place where the
hawser was let go must be farther north than where the
whistling buoy and Pueo line would cut the breakwater and

Pepeekeo line.    It is not easy to fix such place but it may be approximated with the assistance of some of the other evidence.    The distance to the whistling buoy from the place where the Klikitat was anchored, which may be taken as the start of the tow, may with the varying estimates be taken approximately as one and twenty-hundredths miles. A point on the breakwater and Pepeekeo line forty-two hundredths mile north of the place where it would be cut by an extension of the Pueo and whistling buoy line, is giving as much leeway as seems justified by its departure from its line of towing made by the Keauhou in turning after cutting loose the hawser, when Capt. Bruhn testifies that they passed the Klikitat on their return about one hundred feet away, at which time he noticed that he was in line with the whistling buoy and Pueo.    Such point is two and twenty-hundredths miles from the whistling buoy, which with the one and twenty-hundredths miles from the whistling buoy to the start of the tow makes three and forty-hundredths miles; and as the speed of the Keauhou on her return was anything from seven to nine knots, or miles, an hour, she may have covered no more than three and a half knots or miles, during the half hour occupied in her return, especially as her place of anchorage is not given and, as Mullins, the assistant engineer of the Keauhou, says, "There was no particular reason for hurrying; there was plenty of time."

The speed of the tow is variously estimated at two knots, two or three miles, four or five miles, and four and a half or five knots an hour; and the time of the tow beyond the whistling buoy may be taken approximately as 40 minutes, which at a speed of three miles would give a distance of two miles; at a speed of three and a half miles would give a distance of two and thirty-three hundredths miles.    The greater speeds and longer distances testified to seem out of question in view of the testimony of Brigham and Bruhn, analyzed above.

This result is in a measure supported by the testimony of Murray, the chief engineer, and Mullins, the assistant engineer of the Keauhou. Murray says full speed was reached by the tow half a mile before reaching the whistling buoy, and they went at full speed 45 minutes. Mullins' testimony substantially agrees with this. They both say the speed of the tow was from four and a half to five miles, or knots. If we take it at four and a half miles, 6 2/3 minutes would be consumed before reaching the whistling buoy, leaving 38 1/3 minutes for the tow outside of the whistling buoy and a distance of two and eighty-seven-hundredths miles.

Capt. Bruhn says they got up full speed with the tow half way between the knuckle buoy and whistling buoy, and it took them seven minutes to reach the whistling buoy from there. Allowing 40 minutes for the tow outside at the same speed,—four miles an hour, the distance reached was two and eighty-five-hundredths miles.

Brigham says the speed of the tow to the whistling buoy was a little under three miles an hour, and outside of the buoy four or five miles, and that the tow took a trifle over an hour. Taking the speed outside at four and inside at three miles an hour, we have about 24 minutes consumed in reaching the whistling buoy, leaving 36 minutes for the tow outside, giving a distance outside of two and forty-hundredths miles.

So, taking conservative figures as to times and speeds from the witnesses for the libellee, we obtain distances beyond the whistling buoy supposedly reached by the tow, varying from two and forty-hundredths to two and eighty-seven-hundredths miles, and this without using the evidence of Lawson and Ahu, witnesses for the libellee, who fix the distance at one and twenty-five hundredths to one and five-tenths and two miles respectively, or the evidence of the witnesses for the libelant, Capt. Nelson, Hansen and Boswell, who estimate the distance at five-tenths, seventy-

five-hundredths and sixty-hundredths mile, respectively.

A tendency is noticeable in some of the witnesses on both sides to favor the side on which they were called.   This is referred to without criticising the honesty of such witnesses, inasmuch as their observations were mainly casual, not apprehending the subsequent disaster.   Under such circumstances a good deal of guessing was unavoidable as was also the tendency, unconsciously perhaps, to guess favorably toward the side representing their respective employers.

[2] With this great divergence in the testimony on this point, I feel that it is safe to rely upon the crossing of the lines of direction fixed by Brigham and Bruhn, as outlined above, and the necessary correction thereof on account of the departure of the Keauhou from the line of the tow in turning around to the point where she was on the line through the whistling buoy and Pueo, thus fixing the point where the tow was cast off somewhere north of such crossing of lines, which the court finds to' be approximately at "X Ct." on the maps,—exhibits A and B, and two and twenty-hundredths miles from the whistling buoy.

Was this point a safe locality at which to cast loose the Klikitat under all the circumstances?   The circumstances were these:   Although the libellee's witnesses who were on the Keauhou generally agree that the wind was easterly, varying according to some to south of east, a very favorable direction for the Klikitat in getting out to sea, yet the weight of evidence favors the conclusion that, although varying and interspersed with calms, and squally at times, its general direction was about northeast, varying toward the north and northwest.   Hansen, a sailor on the Klikitat, who was aloft loosening sail when the hawser was cast off and therefore in a favorable position for observing, says the sails during the tow did not keep filled, kept shaking all the time, did not draw, wind was squally, and yet the tow was proceeding toward the northeast according to Bruhn or

even more northerly if the point found by the court, "X Ct.", exhibit A, for the letting go the hawser, is correct. Mosher, pilot and harbor master, testified that when the Klikitat was coming in toward the harbor the wind was north on the wharf and appeared to be north and north-east farther outside. Murray said that after they cast off the hawser the wind "was coming away from Pepeekeo", which would signify a northerly wind. At one time in Hansen's examination, he said the wind was five or six points on the weather bow at the time the Keauhou gave the signal blast. This does not agree with his testimony as to the action of the wind on the sails during the tow outside of the whistling buoy, and must stand for what it is worth. It corresponds in a way, however, with Capt. Nelson's testimony that the wind was northeast, east-northeast and north-northeast, blowing in all directions. It would seem that, in view of this testimony and that of Bruhn and Simerson, the wind sometimes on that afternoon swung around to an easterly direction. This must, however, have been exceptional, as the weight of the testimony is convincing that its prevailing directions were from the northeast around northerly to a northwesterly direction. If the wind was northeast or northerly or northwesterly at the point where Bruhn testifies the Klikitat was cast off, she would have been compelled to fall away several points to port to fill her sails, which was what happened according to the testimony of those on board. The same would have been the result if she was cast off at "X Ct.", exhibit A, with the wind northeast or more northerly, in which case she would have pointed well inside of Pepeekeo point as was the case according to the testimony of Brigham, of Boswell, the mate of the Klikitat, and of Nelson, the master, as she could not sail nearer than six points to the wind according to him. Boswell said the wind was baffling and "heading us off to the shore" and Nelson said, in answer to the question "What did you do then?", referring to the

time of the casting off of the hawser, "After I got my sails on I wore the ship around as I was heading toward the shore . . . I was headed about northwest, something in that neighborhood", and added, in answer to a question about the conditions of the sea, "It was a northeast swell setting right . . . in toward the land", which is supported by Capt. Bruhn of the Keauhou, who said, "The sea was a kind of little northerly swell . . . coming along the land from Pepeekeo way." Nelson afterward described the swell as setting in toward the northwest. The evidence that the swell was from a more northerly point is borne out by the evidence as to the effect of the sea on the Klikitat on her starboard tacks.

As to the progress made by the crew of the Klikitat in setting its sails at the time she was let go, it is satisfactorily shown that the fore-and-aft sails were up and one of the square sails on the foremast. According to Capt. Nelson, it took him three-quarters of an hour to finish making sail, which is substantially supported by Brigham. When asked why he wore ship, he replied, "We had to get around to stand to seaward. Q. You couldn't tack? A. I didn't have sails enough on her and the wind was too light to tack." He also said she "was up in the wind and not taking the wind when the hawser was let go." Mate Boswell said they didn't have sail enough up when cast off to navigate her safely. And Otto, one of the crew, said "She was helpless then when she was dropped . . . because she did not have enough sails on her and at the time the hawser was over the bow."

Another circumstance was that the Klikitat was without a load, which must have been obvious to all who saw her. Mullins, in speaking of the speed of the tow, said, "She was not a heavy tow, because she was light." Lawson, the cook, said, when asked if the Klikitat had any cargo on board, "Not a thing but stores and a little dunnage wood." Capt. Nelson says she was drawing 16-6

(meaning feet and inches) when they left Port Gamble and 9-6 when they left Hilo; that they had nothing on board. "We sailed without ballast." Hansen said she was pretty light out of water, had a lot of her hull showing. A sailing vessel without a load is at a disadvantage in beating; some, however, doing better than others on account of their build. The tendency is to drift or move sideways when sailing close hauled or into the wind. It appears that from the time the Klikitat was cast off, although she was trying to get out to sea, away from the land, she steadily approached the shore where she was finally wrecked. She would point one way and move in a different direction. This was obviously due largely to the fact that she had no cargo or ballast. There was another condition, however, affecting her progress that added materially to the difficulty she had in trying to beat out to sea, and that was the northerly swell referred to above, which struck her starboard side whenever she was on the starboard tack, pointing northerly or northwesterly, tending to force her in toward the shore. Brigham's statement as to her movements back and forth, tacking and wearing,—the most reliable testimony given on that point, shows that after being cast off she invariably lost on her starboard tacks when the sea was against her, and made fair headway on her port tacks when the sea was in her favor or at any rate not against her. To illustrate, referring to exhibit A at "TWB 3", she wore around, coming up into the wind on her port tack, that is, with the wind on her port side, on which leg she ran out to sea beyond the Pepeekeo and breakwater line above referred to, to "TWB 5"; then coming about, she sailed on the starboard tack and drifted, or "slid", as Brigham put it, inshore to "TWB 6"; wearing or tacking there, she proceeded on her port tack out to sea again beyond the Pepeekeo and breakwater line to "TWB 7"; then presumably tacking, she again drifted, or slid, on the starboard tack directly inshore to "TWB 8";

another leg on the port tack took her out to "TWB 9";
when she had to come about to the starboard tack as she
was approaching the reef toward the breakwater, and on
such starboard tack, with the swell against her starboard
side, she sailed and drifted directly to the place near where
she finally went ashore, where she luffed up and dropped
her anchor.   On her starboard tacks, although pointing
northerly or northwesterly, it appears that she moved more
or less sideways almost directly inshore, while on her port
tacks she made progress toward the open sea which was
more than lost on her starboards tacks.   While the court
does not recognize the places fixed on the map by Brig-
ham as reliably giving the distances from his position
reached by the Klikitat for the reasons already stated, it
accepts them as approximately showing her movements
transversely to the line between the breakwater and Pepee-
keo point.   Thus we have these important circumstances
existing at the time the Klikitat was cast off by the Keau-
hou at a point approximately two and twenty-hundredths
miles outside of the whistling buoy;—a baffling wind inter-
spersed with squalls and calms, and blowing mainly from
the northeast and more northerly; a northerly swell; the
crew of the Klikitat engaged in making sail with a long,
heavy hawser to take in, and she without cargo or ballast.

The testimony as to the proper distance for towing sail-
ing vessels out from Hilo harbor before letting them go
varies greatly.   It is clear, however, that what is a safe dis-
tance depends on the condition of the weather and the sea
and the sailing conditions of the vessel as to her lading.
These distances as given vary from one to five miles be-
yond the whistling buoy.   It is deemed essential that they
shall be left in a position from which they can clear the
heads,—Pepeekeo and Leleiwa points.

[3] I cannot avoid the conviction that the master of the
Keauhou failed to take the Klikitat out to a safe offing, in
view of the fact that she was without cargo or ballast, and

of the condition of the wind and sea then existing. Both R. Nelson and Mosher regarded the fact of the Klikitat's being light, as placing greater responsibility on the tug. The facts that the crew of the Klikitat had not completed making sail at the time she was let go and that her hawser was still to be taken in, may well be regarded as important elements of the situation that add weight to the complaint against the libellee. The doctrine of *res ipsa loquitur* may be cited in support of this conclusion, inasmuch as results showed that the Klikitat was left in an unsafe place, unless it should appear that her loss was due either to the fault of those on board of her or to inevitable accident. *The Steamer Webb,* 81 U. S. 406, 414. There is no claim on either side that the disaster was due to the latter cause; but the libellee claims that it was due to the master's neglect and bad seamanship.

[4] The testimony in regard to what was first done on board upon being let go is somewhat confusing. The witnesses from the Klikitat, including the master, agree that they first proceeded to go on with the work of making sail. They must have relinquished this before it was completed, and devoted themselves to the hawser, first, trying to haul it in, and then cutting it, as Capt. Nelson says they completed making sail three-quarters of an hour after the hawser was cut, and Brigham's testimony that she increased sail between "TWB 5" and "TWB 6" sugstantially agrees with this. I am not able to find that what was done or not done in relation to the hawser showed evidence of bad seamanship; certainly the cutting of the hawser was a sacrifice tending to favor the safety of the vessel.

The fact that Capt. Nelson made no protest by signals to the Keauhou, after being let go, affords no basis for argument against his seamanship, as he was a stranger in those waters and may well have supposed at the moment that the master of the Keauhou knew what he was about.

*Wolf v. Calkins,* 2 Fed. 788, 793; *The Naos,* 144 Fed. 292, 300.

I feel that Capt. Nelson showed a want of judgment in persisting in his efforts to beat out to sea when he found he was losing ground with every tack and most emphatically so on his starboard tacks. According to all the testimony he had the opportunity, while on his last port tack across the entrance to the harbor, of sailing in with a free wind to a safe anchorage inside; to tack again to starboard and persist in the attempt to beat out to sea at that stage was a blunder. This movement took him directly to the dangerous position from which he was unable to escape by maneuvering or to render secure by anchoring. The question whether he should have taken in sail before anchoring in this predicament hardly concerns the issue. It cannot be said that if he had deferred anchoring until he had taken in sail the anchor would then have saved him. His ship would certainly by that time have drifted in nearer to the lee shore where it was wrecked. For some reason or other his anchor did not hold. Is it likely that it would have held any better if he had waited until he had taken in sail and the ship had drifted farther inshore? If it was an error to drop anchor first, which I do not believe, it was an error *in extremis* and not negligence. *The Steamer Webb,* 81 U. S. 405, 417. The anchor by all accounts was a sufficient one for the vessel. Why it dragged is variously accounted for by the wind squall, by the fact that there was no holding ground, the sea bottom there being gravel from the Wailuku river, and by the supposition that the anchor chain broke, of which there is no evidence.

He should have dropped the port anchor as soon as he found the starboard anchor was dragging, and the failure to do so, either because it was not ready or because he decided not to do it, would seem to be a failure to do all that should have been done to hold the vessel from going

ashore until relief might be had. He said he did not have
a chance to drop his port anchor. If it had been ready,
with cable laid out, it would have taken no time to speak
of. Yet it is uncertain that it would have done any good
if it had been put out.

The question arises from this showing, whether or not
both parties were responsible for the loss,—the libelant
through the mistaken judgment and defective seamanship
of its agent, the master of the Klikitat, and the libellee by
reason of the failure of its agent, the master of the Keau-
hou, to give the Klikitat a safe offing. Does the mistake
in judgment of Capt. Nelson, which led eventually to the
wreck of the Klikitat, relieve the libellee from liability for
its failure to give the Klikitat a safe offing, whereby she
was placed in a situation which resulted in her destruction
through the failure of her master to exercise good judg-
ment and seamanship? The solution of this question may
be aided by first considering the point raised by the libel-
ant, that the master of the Keauhou neglected his duty in
his failure to look after the Klikitat and assist her after he
had let her go, when it was evident from her movements
that she was losing ground in her efforts to gain the open
sea.

It appears from the evidence that after the Klikitat was
let go, the master of the tug paid little attention to her
movements and did not seem to consider that he had any
further responsibility in the matter,—"looked around once
or twice; I think I looked around at her",—and yet he did
observe that she was losing ground in her effort to gain the
open sea. Upon the return of the Keauhou to her an-
chorage, Capt. Bruhn noticed the Klikitat at a place marked
"B 3" on exhibit B, less than a third of a mile from the
shore by the map. From there he gives her course on the
map to "B 4, 5, 6, and 7"; the latter place being where
she luffed up and dropped her anchor and from whence she
moved ashore. He says at no time before she came around

off Honolii Gulch, which the court understands to correspond to "B 7" on the map, did it become evident to him that she might be in danger; and yet it must be obvious to any one, especially to a sailor, that from "B 3" to "B 7" she was tacking back and forth in an. effort to get away from Hilo harbor, not to enter it, and losing all the time. It should have been evident to him that after tacking to starboard from "B 6", exhibit B, or perhaps more correctly from "TWB 9", exhibit A, and still beating out, she was in danger.

[5] Does the fact that the Klikitat could have reached safety by giving up her puprose for the time being of proceeding on her voyage and entering Hilo harbor, relieve the libellee from responsibility; first, for its failure to take the Klikitat out to a safe offing and, second, for its failure to render her assistance when it became evident that she could not make the open sea with her own sails? The Klikitat was bound for the mainland. The master was naturally unwilling to give up his attempt to get away from the shore, and was justified in persevering up to the point where such persistence would expose his ship to danger. This point the court finds to be the starboard tack from "B 6" to "B 7", exhibit B, or, according to exhibit A, from "TWB 9" to "TWB 10", which statement of her movements the court regards as the more reliable of the two. Deciding to go about on the starboard tack instead of giving up and running in to an anchorage in Hilo harbor was, at the worst, a mistake in judgment involving defective seamanship by one new to those waters, and who may. be said to have been brought into such an emergency by the failure of the libellee to give his vessel a safe offing. I am inclined to the opinion that, having undertaken to tow the Klikitat to a safe offing and finding after he had let her go that she was losing ground in her attempt to beat out to sea and was nearing danger, considering her evident persistence in beating out to sea, it was the duty of the master

of the Keauhou, in the exercise of ordinary care and vigilance for the safety of his tow, to have proceeded to her assistance,—his contract under the circumstances not having been completely performed when he cast off her hawser, as shown by the result. *The Printer,* 164 Fed. 314.

The fact of the vessel dragging her anchor simply illustrates one of the dangers to which she was exposed by the action of the libellee.

I do not find negligence on the part of the libelant except possibly in not having its port anchor ready to drop without loss of time, but it is chargeable with bad judgment and defective seamanship in persisting in beating out to sea after tacking at "TWB 9", exhibit A, and perhaps before that time.

The libellee failed to carry out its contract to tow the Klikitat to a safe offing and consequently remained thereafter in a measure responsible for her safety, which responsibility it could have discharged by giving her timely assistance. The duty of a tug to its tow is a continuing one until the completion of the towing contract. In this case the obligation of reasonable care continued until the Klikitat was safe at sea or safe back in Hilo harbor. *The Printer,* 164 Fed. 314, 316; *Alaska v. Williams,* 128 Fed. 362.

In view of these findings, I am of the opinion that there was a division of responsibility between the parties, justifying an equal division of the loss and the costs.

As to the value of the Klikitat at the time of her loss, the testimony varies from fifty-five hundred to ten thousand dollars. The market for lumber schooners at the Sound had been dull for two years previously and was improving in 1912, especially in the fall. Two witnesses, O. A. Case and E. C. Genereaux, both of them marine surveyors, made official surveys of her in June, 1912, for purpose of sale, and both assessed her value at ten thousand dollars. J. L. Hubbard, a ship-builder, long acquainted with the

Klikitat, made the same estimate and called it a conservative one. The market in November was more favorable than in June. W. Walker, chief engineer of the Puget Sound Mill Company, which owned an interest in the Klikitat, had overhauled her thirteen years before. He said, without professing to name her market value, "If anybody wanted a vessel like her ten thousand dollars would be cheap for her." Of the witnesses testifying to a lower value were C. L. Saunders, who had not seen the Klikitat for five or six years; C. E. Wilson, a marine broker, who testified that early in 1912 she was offered to him to sell for eight thousand dollars, and that he did not act in the matter until about the time she sailed and then she had gone; and H. S. Garfield, a marine broker, who was familiar with market prices of sailing vessels in June, 1912, but was not buying or selling in November. He says she was worth six thousand dollars in November, basing such valuation on market value of other vessels estimated in June. Moreover, he had not seen the Klikitat during 1912. I consider the weight of testimony to decidedly favor the larger estimates. Considering broker's charges for selling, the fact that the Klikitat was in Hawaii at the time of her loss, and the time and expense of getting her back to the Sound on the theory of her sale, together with the receipt of one hundred and ten dollars realized at the auction sale of the wreck, I feel that a valuation of nine thousand dollars immediately previous to her loss would not be unfair to either party, and so find.

During the course of the proceedings, Capt. Nelson filed a motion for leave to intervene for loss of personal property in the wreck and afterward testified as to the articles lost and as to their first cost in some cases. In such a matter probably the fair rule is to estimate what it would cost to replace the lost articles, which were in good condition, rather than to consider their market value. By such a rule the aggregate loss would approximate one hundred

dollars. Lawson's testimony as to the landing of the captain's trunk the next day, and his remark as to the contents, is too indefinite to be considered as against Capt. Nelson's testimony. There is no showing as to what part or proportion of the hundred and ten dollars that was bid for the wreck and its contents related to Capt. Nelson's personal property.

In the consideration of the complicated testimony brought out in this case, I have not referred to the question of signals in relation to the casting off of the towing-hawser, made much of by counsel, not deeming it to have any special bearing on the issue. Nor have I felt the evidence to the effect that during the tow the Klikitat at times drew up to some extent on her towline, that is, gained on the tug, showing a fair wind, to be of importance. With the varying direction of the wind, the fact that this sometimes happened does not affect the preponderating weight of the evidence as to the prevailing general direction of the wind.

The testimony in regard to distances is somewhat confused by the indiscriminate use by the sailor witnesses of the words *knots* and *miles* in testifying as to speed of the tow and of the Keauhou on her return. Although the word "knot" is a measure of rate of speed per hour, yet it indirectly gives distances in nautical miles, which are longer than the standard or statute mile. It seemed hopeless, however, to act upon the distinction between the two words; and it is believed that whatever error in regard to distances may exist in this opinion on that account is insufficient to substantially vary the results reached.

Under the considerations hereinbefore set forth, a decree may be entered, awarding the libelant the sum of forty-five hundred dollars, with interest from December 4, 1912, the date of service, and one-half the costs, and one-half the costs to the libellee, and fifty dollars to J. A. Nelson.